(No. 54181.—

JOAN ELLEN SCHOONOVER *et al.,* Appellants, v. THE INDUSTRIAL COMMISSION *et al.* (Caterpillar Tractor Company, Appellee).

*Opinion filed September 30, 1981.*

Knuppel, Grosboll, Becker & Tice, of Petersburg, for appellants.

Forrest D. Serblin, of Peoria, for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

Joan Ellen Schoonover filed a claim with the Industrial Commission in December 1978 to recover for the death of her husband, Kenneth, an employee of Caterpillar Tractor Company in East Peoria. The arbitrator's decision was that Schoonover had died of accidental injuries arising out of and in the course of employment, but the Industrial Commission reversed his decision. The circuit court of Peoria County confirmed the action of the Commission, and the claimant appealed directly to this court under Rule 302(a)(2)

(73 Ill. 2d R. 302(a)(2)). The only question for us is whether the finding of the Industrial Commission was contrary to the manifest weight of the evidence.

Kenneth R. Schoonover, an "emergency order filler" for Caterpillar, died at the age of 47 years. He was five feet six inches in height and weighed approximately 240 pounds. He had suffered a minor stroke three years earlier. He had also been treated for hypertension and obesity since 1972. At the time of his death, he was being treated for elevated blood pressure and was seeing his physician about every six weeks.

An emergency order filler drove an electric lift truck around the supply-parts work area, located the part called for on the requisition ticket, loaded the part on the truck, and drove back to the central work area. Emergency orders were to be filled as quickly as possible. Any orders not filled during the day shift would be filled by the second shift workers.

The decedent and the claimant had had marital problems, and on the day of his death he visited his attorney's office at 1:30 p.m. to discuss legal papers which had been sent to him by his wife's attorney. (They had separated four days earlier.) He complained of a stomach ache upon arriving at the plant, and his supervisor observed that Schoonover was "real pale" shortly before his shift began at 3:18 p.m. At that time, the decedent said that he was sick, that he didn't know if he could make it through the shift, and that he might have to go to the first-aid station. He, however, began work as usual. He unplugged his battery-operated lift truck from a charger, drove it to the central work area and parked it. Once again Schoonover complained of not feeling well and said he thought he would have to go to the first-aid station. Another employee, described as a desk clerk, also was not feeling well and Schoonover, instead of proceeding to fill orders, took over the duties of the desk clerk. The record shows that, while

sitting at a desk, he twice took orders over the phone and tore apart perforated requisition tickets for the order fillers. An employee testified that there was no pressure or stress involved in this process. At about 3:40 p.m., Schoonover telephoned his supervisor and told him that he was feeling worse and was going to first aid.

Schoonover did not reach the first-aid station. He was found lying face down in the locker room around 4:45 p.m. It appears that no one had seen him between the time he left for first aid and when he was found in the locker room. The locker room is about 300 feet from the central work area on a direct line with first aid. When Schoonover was found, he was not breathing and his face had turned a dark color. A company nurse was summoned and was unable to resuscitate him. She testified that his face was very dark blue and was cold to the touch. There was no pulse, the eyelids were closed and the pupils were fixed and nonreactive. She said that she judged the decedent had been dead for some time.

The decedent was taken to a hospital and was pronounced dead at 5:05 p.m. The emergency room physician testified that he believed the decedent had died some period of time before arriving at the hospital. The cause of death according to the autopsy was acute left descending coronary artery occlusion due to coronary arteriosclerosis.

Dr. Seymour R. Goldberg, a specialist in internal medicine, was called as an expert witness by the claimant. In response to a hypothetical question, which included the assumption that the hypothetical man began to fill emergency orders and later attempted to do a co-worker's job as well as his own, Dr. Goldberg, over objection, stated that in his opinion the additional nervous strain and work caused by the absence of the co-worker may have helped to produce a sufficient amount of strain to cause a coronary occlusion. (The objection had been that there was no evidence that the decedent had been performing his own duties in addition to those of the co-worker.) On cross-

examination, however, the doctor said that in responding to the hypothetical question he was assuming that the man was under some type of nervous strain or pressure, and without this assumption his opinion would be different. He went on to say that merely sitting at a desk for a half hour while tearing perforated tickets and answering the telephone would not create stress sufficient to cause a coronary occlusion. Under those circumstances, he acknowledged that his opinion would be that the coronary occlusion had no relationship to the work.

Dr. Goldberg further said on cross-examination that obesity, hypertension, arteriosclerosis, and nervous tension are "among the strongest factors that will produce a coronary occlusion or a heart attack." Too, "hypertension *** is notorious for causing premature atherosclerosis and arteriosclerosis ***. Obesity causes it. Inheritance certainly causes it." The witness stated that arteriosclerosis is progressive in nature and develops over a long period of time.

Dr. Joshua Fierer, a pathologist, was called as a witness by the respondent. A hypothetical question propounded to him included a description of the body of the deceased when found in the locker room. His opinion, based on the coloration of the body as described by the employees, was that the man was dead at least 30 minutes before he was found and probably a significantly longer time than that. This coloration, or *liver mortis,* is an important factor in determining the time of death and it takes, he said, at least a half hour for the blood to settle in vessels after death and produce this effect. He testified that there was "no definite relationship" between the work activities described in the hypothetical and the cause of death.

Dr. Fierer testified, too, that the occlusion, preceded by atherosclerotic plaque breaking away in the artery, "could have occurred at any time."

It is axiomatic that the question whether there was a causal relationship between the employment and the injury

is for the Industrial Commission to determine. The Commission can draw reasonable inferences from the evidence and a court will not disregard them simply because the court might have drawn other inferences. (*Stewart Warner, Datafax Corp. v. Industrial Com.*(1979), 76 Ill. 2d 464.) The Commission's finding will not be set aside unless it is contrary to the manifest weight of the evidence. (*Rice v. Industrial Com.* (1980), 81 Ill. 2d 544.) Upon reviewing the evidence, we consider that the finding of the Commission that the claimant failed to show that Schoonover's death arose out of and in the course of employment was not against the manifest weight of the evidence.

The claimant contends that Schoonover, on the day he died, assumed the duties of the desk clerk, in addition to his own, but she is unable to show in the record that the decedent filled any orders in the brief period he worked that day. Instead, the claimant relies on *Bruno v. Industrial Com.* (1964), 31 Ill. 2d 447, to support her contention that when an employee is found dead at the place where he had been working, assuming no eyewitness, there is a presumption that death occurred in the course of employment. Clearly there is no similarity in the circumstances here to those in *Bruno*. Schoonover, of course, was not in his work area, and witnesses explained his reason for leaving it. More broadly, a review of the whole record indicates death was attributable to natural causes and not to his employment.

For the reasons given, the judgment of the circuit court of Peoria County is affirmed.

*Judgment affirmed.*