EDWARD HINES LUMBER COMPANY, Appellant and Cross-Appellee, v. THE INDUSTRIAL COMMISSION *et al.* (Floyd Pinckney, Appellee and Cross-Appellant).

First District (Industrial Commission Division)   No. 1—89—2358WC

Opinion filed November 26, 1990.—Rehearing denied July 10, 1991.

McCULLOUGH, J., concurring in part and dissenting in part.

Sweeney & Riman, Ltd., of Chicago (Gerald O. Sweeney, of counsel), for appellant.

John E. Cunningham, of Chicago, for appellee.

JUSTICE BARRY delivered the opinion of the court:

The arbitrator found that a heart attack suffered by the petitioner, Floyd Pinckney, arose out of and in the course of his employment with the respondent, Edward Hines Lumber Company. The Industrial Commission (Commission) agreed with that finding, but

reduced the arbitrator's decision regarding the petitioner's average weekly wage. Rather than calculating overtime hours at 1½ times the petitioner's regular hourly rate, as had the arbitrator, the Commission calculated overtime hours at the regular hourly rate. The circuit court confirmed the Commission. The respondent appeals, and the petitioner cross-appeals.

The record shows that on January 4, 1988, the petitioner was working for the respondent. The petitioner's job consisted of putting together loads of lumber for customers. While he used a forklift to lift most of the lumber, at times he would have to lift lumber by hand and break frozen boards apart by hitting them with a hammer or by lifting the 30- to 100-pound stacks and slamming them down.

On this particular day, it was between -7°F and -13°F, with a wind chill factor of -54°F, when petitioner reported for work at 6 a.m. He was working outside and complained to his supervisor about breathing the cold air, noting that he was going to bring in a scarf the next day to put over his mouth. Around 11:30 a.m., he went inside. As he warmed up, he started feeling sick at his stomach, dizzy, and sweaty. The store manager subsequently called the paramedics, who took the petitioner to the hospital. There he was diagnosed by cardiologist Vupparahalli Ramesh as having suffered an acute myocardial infarction. He subsequently underwent bypass surgery.

Dr. Ramesh found that the petitioner had 70% narrowing of the main channel on the left side of his heart. The two arteries that bifurcate from that channel had 80% narrowing. The right coronary artery was completely occluded. However, Dr. Ramesh noted that prior to the infarction the petitioner's heart could still pump 59% of the blood it received. The doctor stated that a normal heart could pump 60% to 80% of the blood it received. He therefore opined that 59% was a reasonable function. He further stated that before the infarction the petitioner was getting an adequate blood supply, but after the infarction he had a substantial lack of blood being supplied to his heart.

Dr. Ramesh testified that the petitioner's work had not caused his coronary artery disease. However, he opined that working in the cold weather had increased the burden on the heart while decreasing the oxygen supplied to it, precipitating the heart attack. The doctor stated that the heart attack had made the bypass surgery necessary "because otherwise *** it would not have been revealed." He explained that the heart attack had called attention to the underlying problem.

The evidence further showed that the 55-year-old, 5-foot-9¼-inch, 215-pound petitioner had missed only a few days here and there due

to colds during his 23 years of employment. He had, however, previously suffered from high blood pressure, was a diabetic, and was overweight. He had stopped smoking in 1986 after 20 years. In 1980, he had taken off 10 days for a physical examination, which had revealed no heart problems. In 1982 and 1987, he had had EKGs done. It is not clear what the 1982 test revealed, but there is no indication that any follow-up tests or treatment resulted from it. The January of 1987 test showed a slight variation from the 1982 test. The doctor recommended that he get this variation checked but did not restrict his employment activities or place him on medication.

Upon returning from a Florida vacation in December of 1987, the petitioner noticed that he had tightness and a cold in his chest and was feeling run down. On December 18, he went to his doctor, who repeated that he should get the EKG change checked. The doctor stated, however, that it would be all right to wait until after the first of the year. The petitioner continued working. On January 2, 1988, he noticed that he was feeling tired, but nothing else bothered him. Two days later he suffered the heart attack.

The petitioner's wife testified that he had had chest pains on New Year's Eve. He had had similar pains off and on for over a year. She noted that on New Year's Day he had not wanted to eat.

Internist William Buckingham, who reviewed the petitioner's medical records on the respondent's behalf and examined the petitioner, testified that the work activities had no effect on and were not the cause of the heart attack. He opined that given the advanced nature of the petitioner's coronary artery disease, the heart attack would have occurred regardless of the activities in which the petitioner was engaged. He further opined that the petitioner had suffered a heart attack between November 17, 1980, and August 31, 1982, and another in January of 1987. Regarding the bypass surgery, Dr. Buckingham stated that it was performed to prevent any further extension of the infarction and to increase the general circulation to the heart.

The petitioner testified that the contract between his union and the respondent provided that he had to work whatever hours the respondent demanded of him. The minimum number of hours was about 10 per day 6 days a week. If an employee refused to work whatever hours the respondent requested, the respondent could fire him. The contract further provided that the petitioner would be paid time and a half for all hours worked over 40 per week.

Two of the respondent's other forklift drivers, one of whom no longer worked for the respondent when the heart attack occurred, testified that employees had to work as much as the respondent re-

quested and that the average weekly amount was about 60 hours. The driver who still worked for the respondent when the heart attack occurred verified the nature of the work and stated that the petitioner had shown no difficulty in doing the work before his heart attack.

The respondent's assistant treasurer testified that the required working hours were 40 per week. He noted, however, that during busy periods employees were required to work overtime.

On appeal, the respondent first argues that the Commission's finding that the petitioner's heart attack arose out of and in the course of his employment was against the manifest weight of the evidence.

■■ We note that it is well established that even where an employee suffers from preexisting heart disease, a heart attack is compensable under the Workers' Compensation Act (the Act) (Ill. Rev. Stat. 1987, ch. 48, par. 138.1 *et seq.*) if work-related stress aggravated the disease and caused the heart attack. (*City of Des Plaines v. Industrial Comm'n* (1983), 95 Ill. 2d 83, 447 N.E.2d 307.) The exception to this rule is where the heart disease has progressed so far that any stress, even the most ordinary exertion, would have brought on the heart attack. (*Doyle v. Industrial Comm'n* (1981), 86 Ill. 2d 544, 427 N.E.2d 1223.) It is the Commission's position to determine the credibility of the witnesses and assess the weight to be given to the evidence. (*Rambert v. Industrial Comm'n* (1985), 133 Ill. App. 3d 895, 477 N.E.2d 1364.) In the presence of conflicting medical opinions, the Commission's determination is given substantial deference and will be overturned on review only if it is against the manifest weight of the evidence. *Material Service Corp. v. Industrial Comm'n* (1983), 97 Ill. 2d 382, 454 N.E.2d 655.

The instant respondent contends that the petitioner's heart disease had progressed so far that any stress would have caused his heart attack. Accordingly, it argues that the petitioner came within the exception to the general rule and the Commission erred in finding that his heart attack arose out of and in the course of his employment.

■ We note that it is undisputed that the petitioner's work had nothing to do with his coronary artery disease. However, Dr. Ramesh testified that the hard work the petitioner was performing in extremely cold weather directly caused the heart attack. While at one point he also agreed with the respondent's attorney's statement that almost any exertion would have been an overexertion as far as his risking having a heart attack, the doctor noted that he agreed with some degree of hesitation. He added that it would have taken more

than just shaving or a similar activity. Dr. Buckingham opined that the work and weather were coincidental, since the petitioner's condition was so bad that any or no activity could have caused the heart attack. This conflicting testimony merely created an evidentiary conflict for the Commission, as the trier of fact, to resolve. The Commission found Dr. Ramesh's testimony more convincing. We find that its decision was not against the manifest weight of the evidence.

The respondent next argues that the Commission erred in finding that the need for bypass surgery was causally related to the heart attack.

■ Section 8(a) of the Workers' Compensation Act provides in relevant part:

"The employer shall provide and pay for all the necessary first aid, medical and surgical services, and all necessary medical, surgical and hospital services thereafter incurred, limited, however, to that which is reasonably required to cure or relieve from the effects of the accidental injury." Ill. Rev. Stat. 1987, ch. 48, par. 138.8(a).

See also *Boker v. Industrial Comm'n* (1986), 141 Ill. App. 3d 51, 489 N.E.2d 913.

■ The Commission can draw reasonable inferences from the evidence, and a reviewing court will not disregard them simply because the court might have drawn other inferences. Further, the Commission's determination will be upheld unless it is contrary to the manifest weight of the evidence. *Schoonover v. Industrial Comm'n* (1981), 86 Ill. 2d 321, 427 N.E.2d 109.

■ In the instant case, while the petitioner had narrowing of the arteries in his heart before the infarction, his heart function was still only 1% below the normal range. Dr. Ramesh noted that this was a reasonable function and that the petitioner was getting an adequate blood supply. The doctor further testified that after the infarction, low-level stress tests showed that the petitioner had a substantial lack of blood being supplied to his heart. While Dr. Ramesh also indicated at one point that the infarction merely revealed the need for bypass surgery, the Commission could properly have found from the above-noted medical evidence that the bypass surgery was necessary to return the petitioner to his preinfarction heart function. Accordingly, we conclude that the Commission's decision was not against the manifest weight of the evidence.

Both the respondent and the petitioner next argue that the Commission erred in basing the petitioner's average weekly wage on a 60-hour work week calculated at his regular hourly rate. The respondent

contends that under section 10 of the Act (Ill. Rev. Stat. 1987, ch. 48, par. 138.10) the Commission should have based the petitioner's average weekly wage only on his income for 40 hours per week. The petitioner contends on cross-appeal that the Commission should have calculated his average weekly wage at the regular hourly rate for the first 40 hours and then at 1½ times that rate for the next 20 hours. The petitioner further argues that the Commission erred in finding that he only worked 60 hours per week.

■ In 1980, the current version of section 10 of the Act took effect, providing in relevant part:

> "The compensation shall be computed on the basis of the 'Average weekly wage' which shall mean the actual earnings of the employee in the employment in which he was working at the time of the injury during the period of 52 weeks ending with the last day of the employee's last full pay period immediately preceding the date of injury, illness or disablement excluding overtime, and bonus divided by 52 ***." Ill. Rev. Stat. 1987, ch. 48, par. 138.10.

Prior to 1980, section 10(g) had provided in relevant part:

> "Earnings, for the purpose of this section, shall be based on the earnings for the number of hours commonly regarded as a day's work for that employment, and shall exclude overtime earnings." Ill. Rev. Stat. 1979, ch. 48, par. 138.10(g).

We note, as do both parties, that this is a matter of first impression in Illinois. While *Kidd v. Industrial Comm'n* (1981), 85 Ill. 2d 534, 426 N.E.2d 822, and *Sroka v. Industrial Comm'n* (1952), 412 Ill. 126, 105 N.E.2d 716, discussed overtime issues under pre-1980 statutes, neither defined the term "overtime."

■ The respondent relies on its interpretation of Federal statutes and cases to support its proposition that "overtime" as used in section 10 of the Act is synonymous with any time over 8 hours per day or 40 hours per week. We find its contention unpersuasive. In *Patton v. Industrial Comm'n* (1986), 147 Ill. App. 3d 738, 739, 498 N.E.2d 539, this court set forth the basic rules of statutory construction:

> "The cardinal rule of statutory construction, to which all other canons and rules are subordinate, is to ascertain and give effect to the true intent and meaning of the legislature. [Citation.] In determining the legislative intent, courts should consider first the statutory language. [Citation.] Where the language is clear it will be given effect without resorting to other aids for construction."

■ Had the legislature intended to exclude from the average weekly wage calculation any time worked over 8 hours per day or 40 hours per week, it could easily have stated this. Instead, the legislature plainly and unambiguously took a more flexible approach, recognizing that different occupations have different regular hours of employment, and excluded only "overtime and bonus." By "overtime" we find that the legislature meant (1) compensation for any hours beyond those the claimant regularly works each week, and (2) extra hourly pay above the claimant's normal hourly wage.

We note that the Montana Supreme Court reached a similar conclusion when confronted with this issue in *Coles v. Seven Eleven Stores* (1985), 217 Mont. 343, 704 P.2d 1048. There, the statute provided that wages were "the average gross earnings received by the employee at the time of the injury for the usual hours of employment in a week, and overtime is not to be considered." The Montana Supreme Court held that if the work record showed that the employer hired the claimant expecting overtime work and the claimant actually worked overtime on a consistent and regular basis, then that overtime became part of the usual hours of employment. However, those extra hours would be included in the wage calculation at the regular hourly rate.

From our discussion it can be deduced that "overtime" under the Act is a subjective standard. This is important to keep in mind because, in contrast to the petitioner's situation, many people in today's workforce have regular workweeks of less than 40 hours. For those people, overtime under the Act is anything above their regular workweek. If, for example, a person who regularly works 25 hours per week works 35 hours one week, that extra 10 hours would not be included in the average weekly wage calculation.

■ Accordingly, we conclude as a matter of law that the Commission properly calculated the petitioner's average hourly wage based on the hours he regularly worked, but at his straight-time rate. We further find, however, that as a factual matter the Commission erred in determining that the petitioner averaged only 60 hours per week. The evidence showed that in the year preceding the petitioner's heart attack, he earned $54,633.30. During the first 21 weeks of that year, he was paid $12.87 an hour for the first 40 hours worked per week and $19.30 for any hours thereafter. During the last 31 weeks of the year, he was paid $13.27 per hour for the first 40 hours and $19.90 thereafter. The petitioner therefore actually averaged 67 hours per week. Accordingly, we find that the Commission's determination that the petitioner regularly averaged 60 hours per week was against

the manifest weight of the evidence. (*Smith v. Industrial Comm'n* (1988), 170 Ill. App. 3d 626, 525 N.E.2d 81.) We therefore vacate the Commission's determination that the petitioner averaged 60 hours per week and recalculate his benefits based on 67 hours per week. This results in an average weekly wage of $878.27. The respondent shall therefore pay to the petitioner $585.51 for 26³/₇ weeks, that being the Commission's uncontested finding regarding his period of temporary total incapacity (Ill. Rev. Stat. 1989, ch. 48, par. 138.8(b)).

We note for clarification that our decision does not conflict with our earlier decision in *Illinois-Iowa Blacktop, Inc. v. Industrial Comm'n* (1989), 180 Ill. App. 3d 885, 536 N.E.2d 1008. There we stated that overtime wages are not considered in calculating average weekly wages. However, that case involved a seasonal construction worker for whom the regular week was customarily considered to be 40 hours, with anything beyond that being overtime.

The judgment of the circuit court of Cook County is affirmed with the exception of the court's confirmation of the Commission's finding that the petitioner's average weekly wage should be based on 60 hours. That portion of the judgment is vacated, and the petitioner is awarded $585.51 for 26³/₇ weeks.

Affirmed as modified.

McNAMARA, WOODWARD, and LEWIS, JJ., concur.

JUSTICE McCULLOUGH, concurring in part and dissenting in part:

I disagree with the majority's finding that the average weekly wage should be based upon 67 hours per week worked by the claimant.

The Workmen's Compensation Act of the State of Illinois does not define overtime. The Eight Hour Work Day Act (Ill. Rev. Stat. 1987, ch. 48, par. 1) does define hours of labor and overtime compensation. Specifically, section 1 provides hours of labor as follows:

> "1. On and after the first day of May 1867, eight hours of labor between the rising and the setting of the sun, in all mechanical trades, arts and employments, and other cases of labor and service by the day, except farm employments, shall constitute and be a legal day's work, where there is no special contract or agreement to the contrary." (Ill. Rev. Stat. 1987, ch. 48, par. 1.)

In this case, as pointed out by the majority, two fellow employees of the claimant testified that employees had to work as much as the respondent requested and that the average weekly amount was about 60 hours. The respondent's assistant treasurer testified that the required working hours were 40 per week but that during busy periods employees were required to work overtime. As stated in the claimant's brief, the work hours amounted to at least 10 per day, 6 days per week, with the weekly total coming to at least 60 hours. There was also testimony that the union contract required the employee to work the hours that the company wanted, and in the event the employee did not do so, he was subject to dismissal. As testified to, the minimum hours were 10 to 10½ hours per day.

This testimony, along with the definition in section 1 which states that eight hours of labor shall constitute a legal day's work "where there is no special contract or agreement to the contrary," is a complete justification for the Commission finding that the employee's regular workweek was 60 hours. The Commission could find that pursuant to the section cited, there was a special contract or agreement between the employer and claimant and, based upon the evidence presented, the employee was expected to work 60 hours per week.

It could be argued that even accepting the Commission's determination that the workweek was 60 hours renders the word "overtime" as used in the Workers' Compensation Act meaningless. To say that the employee's workweek was 67 hours completely emasculates the Act and renders meaningless the word "overtime." To arbitrarily use the claimant's income for the last 52 weeks, regardless of overtime, is contrary to the provisions of section 10 of the Workers' Compensation Act. The Commission's determination that the workweek was 60 hours is not against the manifest weight of the evidence.

It is then necessary to determine what the average weekly wage of the claimant was, based upon the 60 hours per week of work. The Commission found that the claimant's average weekly wage should be based upon 60 hours per week at his regular pay scale. The claimant should be paid at the rate or actual income he received for the 60 hours, which would be 40 hours of regular rate and 20 hours of time and a half. Based upon the Commission's determination that the workweek was 60 hours and keeping in mind that section 4(a) of the Minimum Wage Law (Ill. Rev. Stat. 1987, ch. 48, par. 1004(a)) provides that the employer must pay an employee in excess of the regular hours' work at a rate not less than 1½ times the regular rate at which he is employed, the employer knew at the time he was employing the claimant for the 60-hour week that he would be required to

pay 20 hours at time and a half. The result is that claimant's average weekly wage should be 40 hours at the regular rate and 20 hours at the rate paid for the excess time. This is consistent with the provisions of the Eight Hour Work Day Act defining a legal day's work and at the same time gives credence to the Commission's finding that the relationship between the claimant and the employer was that he would work 60 hours per week.

Once again, the Commission's determination that employees were required to work 60 hours per week but were not required to work in excess of that time is not against the manifest weight standard.

I do not disagree with the Commission's findings as affirmed by the circuit court that the employee sustained accidental injuries which arose out of and during his employment and that there was a causal connection between the accident and the need for the bypass surgery.