961 N.E.2d 807 (2011)
356 Ill. Dec. 418
ARCELOR MITTAL STEEL, Appellant,
v.
ILLINOIS WORKERS' COMPENSATION COMMISSION et al. (Robert Common, Appellee).
No. 1-10-2180 WC.
Appellate Court of Illinois, First District, Workers' Compensation Commission Division.
November 7, 2011.
*809 M.P. Cahill, Spiegel & Cahill, P.C., Hinsdale, for Appellant.
Ian Elfenbaum, Elfenbaum Evers & Amarilio, P.C., Chicago, for Appellees.

OPINION
Justice McCULLOUGH delivered the judgment of the court, with opinion.
¶ 1 On April 29, 2008, claimant, Robert Common filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 through 30 (West 2006)), seeking benefits from employer, Arcelor Mittal Steel, for injuries suffered to his right arm on November 29, 2007.
¶ 2 Following a hearing, an arbitrator found claimant proved he sustained injuries arising out of and in the course of his employment with employer. The arbitrator awarded claimant temporary total disability (TTD) benefits in the amount of $935.55 for a period of 21 6/7 weeks; and permanent partial disability (PPD) benefits in the amount of $636.15 for a period of 69.575 weeks, representing 27.55% loss of use of the right arm. In computing the TTD and PPD, the arbitrator included scheduled overtime earnings and production bonuses in the calculation of claimant's average weekly wage and fixed his average weekly wage at $1,403.32.
¶ 3 On review, the Workers' Compensation Commission (Commission) struck three sentences from the arbitrator's discussion of penalties. Further, the Commission corrected "the Order portion of the Arbitrator's Decision to reflect, consistently with the findings, the permanency award for loss of the use of the right arm to the extent of 27.5 percent thereof," and not 27.55%. In all other respects, the Commission affirmed and adopted the arbitrator's decision. The circuit court confirmed the Commission's decision.
¶ 4 Employer appeals, arguing overtime wages and production bonuses should not have been included in the Commission's calculation of claimant's average weekly wage for purposes of determining the weekly benefits to which claimant is entitled for TTD and PPD. We disagree.
¶ 5 Employer does not dispute the fact that claimant suffered an injury arising out of and in the course of his employment on November 27, 2007, nor does employer contest the nature and extent of the claimant's injuries or his period of disability. Employer only asserts as error the Commission's inclusion of overtime earnings and production bonuses in calculating claimant's average weekly wage for purposes of determining the weekly benefits to which claimant is entitled for TTD and PPD. Consequently, we will present only those facts necessary to an analysis of the issues.
¶ 6 Claimant began working for employer in 2002 as a mechanical maintenance technician. On November 29, 2007, claimant sustained right arm injuries while carrying a piece of steel weighing approximately 300 pounds.
¶ 7 Claimant is a member of the United Steel Workers Union, Local 9481. During the 52 weeks preceding his injury, claimant earned $21.03 per hour and received a "shift differential" and "incentive pay." According to claimant, his regular eight-hour shift began at 7 a.m. and ended at 3 p.m., Monday through Friday. Claimant testified that his supervisor posts a work schedule on Thursday afternoon, for the *810 next week. A "2" on the schedule indicates that individual is assigned to work a 12-hour shift on the designated day. In addition to the required 12-hour shift, claimant also works unscheduled overtime.
¶ 8 Claimant testified that the purpose of incentive pay is to produce as much high quality steel as safely as possible. Incentive pay varies weekly based on productivity and the specific crew. If the requirements that trigger a productivity or safety incentive are not met, no incentive is paid out.
¶ 9 Ken Knaga is the manager of human resources, labor relations, and payroll for employer. Knaga testified that the production bonus plan is an important part of an employee's payment package. On November 29, 2007, the production bonus plan was a part of the collective bargaining agreement. The plan has a production component and a safety component. If certain production levels are met, the corresponding bonus is paid. Additionally, if no time is lost due to a work-related accident, a safety bonus is paid. However, if a work accident occurs or a certain production level is not met, no bonus for that component is paid. The production bonus is based on the quality of saleable goods made. Knaga testified that a larger portion of the bonus is tied to production levels. If the benchmarks are hit, each employee on the team gets the bonus. If the benchmark is not met, no bonus is given to any member of the team.
¶ 10 The collective bargaining agreement refers to the production bonus plan as "the incentive plan" and it is referred to by employer as "a production plan." Knaga testified that the bonus is not tied to the stock price, is not seasonal, and is not simply given due to the generosity of management. If an employee is sick or does not work, he does not get the bonus. The bonus is paid biweekly and is included as taxable income on the W-2 form.
¶ 11 Knaga testified that the production portion of the bonus is only available when the plant is producing steel. When the plant closes, no steel is produced, and no bonus is paid.
¶ 12 In a letter dated July 14, 2008, Gary Norgren, general manager for operations for employer, clarified for claimant (1) the production bonus and (2) scheduled overtime, stating:
"[Y]ou are eligible to receive a weekly production bonus that is based on 2 componentsquality tons per 12 hour shift and safety performance. Given that both these components can vary week to week, the percentages for the production bonus can range from 0% to something in excess of 50%.
Regarding overtime, you are normally scheduled to work 40 hours per week. Occasionally, you are scheduled to work overtime. Namely, this is during the 1-day outages that we have periodically where you are scheduled an additional 2 to 8 hours of work that day. However, even though you are scheduled these extra hours, you can be excused from this overtime upon request and a valid reason. Otherwise, most of your overtime is on a volunteer basis." (Emphases added.)
¶ 13 According to employer's absences policy, any failure of an employee to work a scheduled shift or accepted overtime shift is counted as an absence with the exception of (1) vacations, (2) jury duty, (3) a witness subpoena, (4) funeral leave, (5) disciplinary suspension, (6) military encampment, and (7) qualified (a) union business, (b) leave, (c) sickness and accident, and (d) workers' compensation. An employee who reports off work for one or two consecutive shifts without a valid reason will be charged with one occurrence. An *811 employee may be absent from work for four separate occurrences before he is put into the absentee control program. The employees' occurrences are measured on a rolling 12-month period. Upon a seventh occurrence in a rolling 12-month period, an employee will be discharged.
¶ 14 A supervisor may also determine a "valid reason" and granting such request is at the supervisor's own discretion. Knaga stated that guidelines are in effect for the supervisors to follow. Knaga admitted that different supervisors may enforce this policy more strictly than others. Knaga testified that the management rights clause of the contract allows employer to determine what hours per day employees work.
¶ 15 Gary Bender is president of Local 9481. Bender and claimant do not work in the same area of the plant and, thus, have a different supervisor. Bender testified that overtime on scheduled 12-hour downturn days is mandatory.
¶ 16 Bender testified that the exchanging of shifts with the supervisor's approval is permitted. Bender stated that if someone is scheduled to work an 8- or 12-hour shift and not on approved leave, and calls in 2 hours before the shift starts and calls off without the permission of the supervisor, that would be considered an occurrence. Bender agreed that employees can be dismissed from overtime work with a "valid reason." Bender testified that he had knowledge of shift switching in claimant's area but did not know the specifics of those switches. Bender stated that in claimant's area, the supervisor has a list that employees can sign in order to work unscheduled overtime.
¶ 17 William Pagorek is claimant's supervisor. Pagorek testified that he places all employees on the schedule during downturns, outages and relines. In the year preceding the accident, downturns were scheduled based on production and were normally done on Wednesdays. Although employer tried to schedule downturns at regular intervals, they were actually based on the supply of iron received. Pagorek testified that downturns, outages, and relines are usually reflected on the regular schedules and were usually days on which an 8-hour-a-day employee was scheduled to work 12 hours.
¶ 18 With regard to requests for time off, Pagorek stated that if an employee provides him with a request for time off at least 24 hours in advance of the requested time off, the request is usually granted. Pagorek also allowed switching of shifts with permission. Pagorek testified that switching during downturns, outages and relines happens less often since all employees are usually scheduled to work during that period. Pagorek testified that if an employee is scheduled to work a 12-hour shift, he is expected to work the entire 12 hours; he cannot refuse to work the extra 4 hours. If an employee fails to report for work and does not call off, he receives a verbal reprimand. Pagorek also stated that if an employee calls in right before his shift is to start and does not have a "valid reason", that is considered an occurrence. Pagorek determines what constitutes a "valid reason."
¶ 19 Pagorek testified that claimant's regular hours were eight hours a day, five days a week. On downturn, outage, or reline days, if claimant is scheduled to work 12 hours, he is expected to work those extra 4 hours. Pagorek testified that in addition to scheduled overtime, there is also unscheduled overtime on any given day that is assigned on a voluntary basis, starting with the most senior qualified employee.
¶ 20 Pagorek testified that all employees are entitled to production incentives and *812 these production incentives are only paid when product is being made. Pagorek stated that if production is not operating due to downturns, outages, or relines, no production incentives are paid. He further testified that production incentives are based directly on the levels of production.
¶ 21 The production bonus plan in effect when claimant was injured was offered into evidence. Payout was identified as biweekly, subject to taxes and other withholdings. The amount is also identified on the check as a separate line item, "Production Bonus." The lump-sum payout is considered as earnings for pension purposes. The calculated amount will be based on hours actually worked during the two-week period, excluding a premium portion associated with overtime, Sunday, and holiday hours.
¶ 22 Following the hearing, the arbitrator found claimant proved he sustained injuries arising out of and in the course of his employment with employer. The arbitrator awarded claimant TTD benefits in the amount of $935.55 for a period of 21 6/7 weeks; and PPD benefits in the amount of $636.15 for a period of 69.575 weeks, representing 27.55% loss of use of the right arm. In computing the TTD and PPD, the arbitrator included the scheduled overtime earnings and production bonuses in the calculation of claimant's average weekly wage and fixed his average weekly wage at $1,403.32.
¶ 23 Employer filed a petition for review of the arbitrator's decision before the Commission. The Commission struck three sentences from the arbitrator's discussion of penalties. Further, the Commission corrected "the Order portion of the Arbitrator's Decision to reflect, consistently with the findings, the permanency award for loss of the use of the right arm to the extent of 27.5 percent thereof," and not 27.55%. In all other respects, the Commission affirmed and adopted the arbitrator's decision.
¶ 24 The Commission found claimant worked 39 weeks during the 52-week period prior to his injury on November 29, 2007. During that period, he was paid $35,881.06 "excluding overtime and bonus," $3,638.19 for "overtime calculated at straight time," and $15,210.39 for bonus or incentive pay. The total of these sums is $54,729.64 or an average of $1,403.32 per week.
¶ 25 In fixing claimant's average weekly wage at $1,403.32 per week, the Commission noted that, for the 39-week period prior to his injury on November 29, 2007, claimant worked 173 hours of scheduled "overtime calculated at straight time." The Commission did not include the unscheduled or voluntary overtime wages in calculating claimant's average weekly wage. The Commission multiplied claimant's scheduled overtime hours (173) by his regular pay rate of $21.03 per hour, added his regular earnings for that period of $35,881.06, and his bonus and incentive pay for that period of $15,210.39, and then divided the total, $54,729.64, by 39 to arrive at an average weekly wage of $1,403.32. Based upon an average weekly wage of $1,403.32, the Commission fixed the claimant's TTD benefits in the amount of $935.55 for a period of 21 6/7 weeks; and PPD benefits in the amount of $636.15 for a period of 69,575 weeks, representing 27.5% loss of use of the right arm.
¶ 26 The Commission noted that on days claimant was scheduled to work a "2" or 12-hour shift, all other employees in the same crew were also scheduled to work 12 hours. The Commission found these days were mandatory work days for claimant. Even though Pagorek stated that he would allow switches, the Commission noted no such switches were possible on these days *813 since all members of claimant's team were already scheduled to work the 12-hour shift. During this same period, claimant also worked additional overtime hours that the Commission found were not scheduled or mandatory and were worked by claimant only because he voluntarily agreed to work.
¶ 27 Further, the Commission found the incentive pay was based on actual work performed and thus, "should be included when calculating the average weekly wage." In support of its finding, the Commission stated:
"It is unrebutted that if steel is not being produced no bonus/incentive can be paid. Additionally, if people are injured at work, production suffers and therefore the safety piece of the bonus/incentive is also in `consideration for work.' The arbitrator notes that the amount of steel produced has a direct impact on the amount of bonus/incentive earned. If the employees do not work hard enough to produce the minimum level of steel that is required for a bonus/incentive, no bonus/incentive is paid. However, the harder they work and the more steel they produce, the greater the bonus/incentive earned. The arbitrator finds such type of bonus/incentive is in consideration for the work the petitioner performs. The arbitrator notes that if someone is off or not working they do not receive the bonus." (Emphasis in original.)
¶ 28 Thereafter, employer filed a petition seeking judicial review in the circuit court of Cook County. The circuit court confirmed the Commission's decision and this appeal followed.
¶ 29 Employer argues the Commission erred by including overtime earnings and production bonuses in calculating claimant's average weekly wage for purposes of determining the weekly benefits to which claimant is entitled for TTD and PPD. We disagree.
¶ 30 Section 10 of the Act provides that the weekly benefits to which an injured employee is entitled for TTD and PPD under section 8 of the Act shall be computed on the basis of his or her average weekly wage. 820 ILCS 305/10 (West 2006). The statute defines "average weekly wage" as "the actual earnings of the employee in the employment in which he was working at the time of the injury during the period of 52 weeks ending with the last day of the employee's last full pay period immediately preceding the date of his injury, illness or disablement excluding overtime, and bonus divided by 52; but if the injured employee lost 5 or more calendar days during such period, whether or not in the same week, then the earnings for the remainder of such 52 weeks shall be divided by the number of weeks and parts thereof remaining after the time so lost has been deducted." (Emphasis added.) 820 ILCS 305/10 (West 2006).
¶ 31 The claimant in a workers' compensation proceeding has the burden of establishing his average weekly wage. Edward Don Co. v. Industrial Comm'n, 344 Ill. App.3d 643, 655, 279 Ill.Dec. 726, 801 N.E.2d 18, 27-28 (2003). The determination of a claimant's average weekly wage is a question of fact and the Commission's determination will not be disturbed unless it is contrary to the manifest weight of the evidence. Edward Don Co., 344 Ill.App.3d at 655, 279 Ill.Dec. 726, 801 N.E.2d at 28.
¶ 32 We first address whether the Commission erred by including overtime earnings in calculating claimant's average weekly wage. This court has previously addressed the issue of whether the Commission erred by including overtime earnings in calculating a claimant's average weekly wage.
*814 ¶ 33 In Edward Hines Lumber Co. v. Industrial Comm'n, 215 Ill.App.3d 659, 159 Ill.Dec. 174, 575 N.E.2d 1234 (1990), this court held that "overtime" consists of compensation for hours beyond those the employee regularly works each week and extra hourly pay above the employee's normal hourly wage. Edward Hines Lumber Co., 215 Ill.App.3d at 666, 159 Ill.Dec. 174, 575 N.E.2d at 1238. In that case, the evidence established that the claimant was required to work whatever hours the employer demanded and that the minimum number of hours he worked was 10 per day, 6 days per week. Edward Hines Lumber Co., 215 Ill.App.3d at 662, 159 Ill.Dec. 174, 575 N.E.2d at 1236. Finding that the claimant actually averaged 67 hours of work per week, we held that the calculation of the claimant's average weekly wage under section 10 of the Act should be based on his earnings for 67 hours per week. Edward Hines Lumber Co., 215 Ill.App.3d at 666-67, 159 Ill.Dec. 174, 575 N.E.2d at 1238-39.
¶ 34 In Ogle v. Industrial Comm'n, 284 Ill.App.3d 1093, 220 Ill.Dec. 562, 673 N.E.2d 706 (1996), we held that the claimant's average weekly wage should have been based upon his earnings for a 48-hour work week. Ogle, 284 Ill.App.3d at 1097, 220 Ill.Dec. 562, 673 N.E.2d at 709. Our holding was based upon evidence which established that the claimant's normal work week consisted of 48 hours, his union contract made overtime work mandatory, and it was not until the claimant had worked 48 hours or more that he was not required to work any additional overtime. The evidence also established that the claimant was only able to work less than 48 hours per week at the employer's discretion. Ogle, 284 Ill.App.3d at 1096, 220 Ill.Dec. 562, 673 N.E.2d at 709.
¶ 35 In Edward Don Co., this court concluded that the Commission erred in including the claimant's earnings for 77 hours of overtime when calculating his average weekly wage pursuant to section 10 of the Act. Edward Don Co., 344 Ill.App.3d at 657, 279 Ill.Dec. 726, 801 N.E.2d at 29. Although the wage summary sheets introduced into evidence reflected that the claimant had worked some overtime in 15 of the 16 weeks prior to his injury, there was no evidence that he was required to "work overtime as a condition of his employment or that he consistently worked a set number of overtime hours each week." Edward Don Co., 344 Ill.App.3d at 657, 279 Ill.Dec. 726, 801 N.E.2d at 29.
¶ 36 In Freesen, Inc. v. Industrial Comm'n, 348 Ill.App.3d 1035, 285 Ill.Dec. 81, 811 N.E.2d 322 (2004), although the claimant presented evidence that he worked some overtime in 22 of the 45 weeks in which he worked prior to his accident, there was no evidence that (1) he was required to work overtime as a condition of his employment, (2) he consistently worked a set number of hours of overtime each week, or (3) the overtime hours he worked were part of his regular hours of employment. Freesen, Inc., 348 Ill.App.3d at 1042, 285 Ill.Dec. 81, 811 N.E.2d at 329. We found, therefore, that the Commission had erred in including the claimant's overtime hours in calculating his average weekly wage. Freesen, Inc., 348 Ill.App.3d at 1042-43, 285 Ill.Dec. 81, 811 N.E.2d at 329.
¶ 37 In Airborne Express, Inc. v. Illinois Workers' Compensation Comm'n, 372 Ill.App.3d 549, 310 Ill.Dec. 259, 865 N.E.2d 979 (2007), this court concluded that the Commission erred in including the claimant's earnings for 538.70 hours of overtime when calculating his average weekly wage pursuant to section 10 of the Act. The uncontradicted evidence established that the claimant was not required to work the 538.70 hours of overtime as a condition of his employment. Rather, he used his seniority *815 and requested to work overtime. Airborne Express, Inc., 372 Ill.App.3d at 554, 310 Ill.Dec. 259, 865 N.E.2d at 984.
¶ 38 In this case, claimant testified that his regular workweek consisted of daily eight-hour shifts beginning at 7 a.m. and ending at 3 p.m., Monday through Friday. Additionally, claimant worked scheduled overtime "associated with down turns, outages, and relines." Where denoted as a "2" on the weekly schedule, claimant worked a 12-hour shift. In addition to the required 12-hour shift, claimant also work unscheduled, voluntary overtime. The Commission did not include the unscheduled, voluntary overtime wages in calculating claimant's average weekly wage.
¶ 39 The uncontradicted evidence established that claimant was required to work the 173 hours of scheduled overtime as a condition of his employment. Claimant did not use his seniority and did not request to work the scheduled overtime. Although his supervisor testified claimant could switch the scheduled overtime with another employee, all employees were usually scheduled to work overtime "associated with down turns, outages, and relines." The Commission did not err by including the scheduled overtime earnings in calculating claimant's average weekly wage.
¶ 40 We next address whether the Commission erred by including production bonuses in calculating claimant's average weekly wage. "Bonus" is commonly defined as "something in addition to what is expected or strictly due." Webster's Third New International Dictionary 167 (1981). We note a distinction between incentive-based pay, which an employee receives in consideration for specific work performed as a matter of contractual right, and a bonus, which an employee receives for no consideration or in consideration of overall performance at the sole discretion of the employer. See e.g., Levkovitz v. Industrial Comm'n, 256 Ill.App.3d 1075, 1081, 195 Ill.Dec. 360, 628 N.E.2d 824, 828 (1993) ("There is nothing in the record to indicate claimant received these meals `as consideration for work.' * * * These meals appear to more closely resemble a `bonus,' i.e., extra benefits given to the employee by the employer.").
¶ 41 In this case, claimant received production bonuses in consideration for work performed pursuant to his collective bargaining agreement and not as an extra benefit provided by employer gratuitously. The production bonus plan stated that it was an important part of claimant's compensation package. The employer calculated production bonuses based upon measures of volume and quality of steel produced and the number of days worked without a "lost time accident." Employer had no discretion and was obligated to pay the production bonuses if earned by its employees; the production bonuses were "strictly due." Employer paid the production bonuses only to employees who had worked on the dates the objective measures were taken. The fact that an employee who did not work on those days would not receive the production bonuses further supports the Commission's finding that the production bonuses were not a bonus as contemplated by section 10 of the Act, but rather received in consideration for work actually performed. Because the production bonuses earned by claimant were not a "bonus as" contemplated under section 10 of the Act, the Commission did not err by including production bonuses in calculating claimant's average weekly wage.
¶ 42 The determination of a claimant's average weekly wage for purposes of calculating TTD and PPD under section 8 of the Act is a question of fact. Edward Don Co., 344 Ill.App.3d at 655, 279 Ill.Dec. 726, 801 N.E.2d at 28. The Commission's resolution of the question *816 will not be disturbed on appeal unless it is against the manifest weight of the evidence. Ogle, 284 Ill.App.3d at 1096, 220 Ill.Dec. 562, 673 N.E.2d at 708-09. In order for a finding to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. Ogle, 284 Ill.App.3d at 1096, 220 Ill.Dec. 562, 673 N.E.2d at 708-09.
¶ 43 The 173 hours of scheduled overtime which the Commission included in its calculation of claimant's average weekly wage were a part of claimant's regular hours of employment and were hours claimant was required to work as a condition of his employment. Claimant consistently worked scheduled overtime, a 12-hour work day "associated with down turns, outages, and relines." Further, the $15,210.39 in production bonuses which the Commission included in its calculation of claimant's average weekly wage were in consideration for work performed pursuant to the collective bargaining agreement.
¶ 44 The Commission's calculation of claimant's average weekly wage and its dependent calculations of the weekly TTD and PPD benefits to which claimant is entitled are not against the manifest weight of the evidence. The Commission did not err by including the 173 hours of scheduled overtime and the $15,210.39 in production bonuses, earned in the 39 weeks prior to claimant's accident, in calculating claimant's average weekly wage.
¶ 45 For the reasons stated, we affirm the circuit court's judgment confirming the Commission's decision.
¶ 46 Affirmed.
Justices HOFFMAN, HUDSON, HOLDRIDGE and STEWART concurred in this judgment and opinion.