ILLINOIS-IOWA BLACKTOP, INC., Appellant, v. THE INDUSTRIAL
COMMISSION *et al.* (Odell Beck, Appellee).

Third District (Industrial Commission Division)   No. 3—87—0101WC

Opinion filed April 7, 1989.

McCULLOUGH, J., specially concurring.

William R. Stengel, Jr., of Coyle, Gilman & Stengel, of Rock Island, for appellant.

John H. Westensee, of Braud, Warner, Neppl & Westensee, of Rock Island, for appellee.

Stevenson, Rusin & Friedman, of Chicago, for *amicus curiae* Illinois Manufacturers' Association.

Robert B. Maher, of Chicago, for *amicus curiae* Illinois Construction Industry Committee.

Arthur C. Chapman, of Chapman & Roin, of Chicago, for *amicus curiae* Illinois Mechanical Specialty Contractors Association.

PRESIDING JUSTICE BARRY delivered the opinion of the court:

The arbitrator found that the petitioner, Odell Beck, a 51-year-old construction worker, was illiterate with a third-grade education and was totally and permanently disabled by back, hip and leg injuries suffered when he fell from a stationary truck. He found that the petitioner's average weekly wage was $511.95 and that he was entitled to receive $341.30 per week. The Industrial Commission (Commission) affirmed the arbitrator's findings and the circuit court confirmed the Commission's decision. The respondent, Illinois-Iowa Blacktop, Inc., appealed to this court.

On April 21, 1988, we entered an opinion affirming the circuit court. We subsequently granted the respondent's petition for rehearing. We further allowed the Illinois Manufacturers' Association to file a brief *amicus curiae* in the rehearing, and we allowed the Illinois Mechanical Specialty Contractors Association and the Illinois Construction Industry Committee to adopt the *amicus curiae* brief. The *amicus* limited its presentation to the issue of the average weekly

wage. Having considered the arguments advanced on rehearing, we find as follows.

One of the respondent's two issues on appeal is whether the Commission's determination that the petitioner was permanently totally disabled was against the manifest weight of the evidence. The evidence regarding the total permanent disability issue showed that on September 30, 1982, the petitioner was working for the respondent shoveling asphalt from the back of a stationary truck. The tailgate on which he stood suddenly gave way, causing him to fall approximately four feet, injuring his back, left hip and left leg.

The petitioner subsequently consulted several doctors and engaged in physical therapy under their care. On December 30, 1982, Dr. D'Angelo, an osteopathic physician, pronounced the petitioner fit to return to light-duty work requiring no repetitive bending, stooping, or lifting of objects greater than 20 pounds. The respondent had no work available within these restrictions at the beginning of the 1983 work season.

On July 28, 1983, Dr. D'Angelo released the petitioner, who had undergone further physical therapy, to return to work without restrictions. For the next couple of days, the petitioner operated a jackhammer for the respondent. He felt "something coming loose" in his back, which then became stiff and painful. The petitioner also tried working as a flagman for the respondent, but was unable to remain standing for long periods. He then discontinued working and has not worked since August of 1983.

Surgeon Myron B. Stachniw saw the petitioner and diagnosed him as suffering from herniated discs. On November 11, 1983, Dr. Stachniw performed a chemonucleolysis with chymopapain on the petitioner's L4-L5 and L5-S1 discs. Secondarily, he diagnosed that the petitioner suffered from hypertension.

The medical evidence in the record consistently showed that the petitioner could perform only light work. Dr. Stachniw opined that the petitioner could do some sweeping and cleaning and could lift 20 pounds maximum. He could not sit or stand for a prolonged period, or perform any jobs requiring frequent bending or stooping. Dr. F. Dale Wilson stated that the petitioner could walk six or seven blocks; could sit one-half hour; could stand 10 to 15 minutes; should avoid bending or twisting and use care in turning; should avoid jolts or jars to his spine; and should not lift more than 10 to 15 pounds.

Given these restrictions, the experts uniformly doubted the petitioner's ability to find work. Since 1965, the 53-year-old petitioner had worked exclusively for the respondent, performing only un-

skilled, manual labor. His formal education ended in the third grade and he could not read or write. Dr. Robert Chesser questioned how realistic a retraining program would be. Dr. Wilson agreed, adding that it was unlikely the petitioner would ever be gainfully employed again. G. Brian Paprocki, a vocational consultant hired by the petitioner, concluded that the petitioner had sustained a 100% industrial disability, in that there existed no realistic chance of the petitioner's finding a job given his occupational abilities and his medical restrictions.

The respondent had no suitable work available for the petitioner. No rehabilitation offer was made by the respondent. The petitioner has not sought work elsewhere.

The evidence regarding the petitioner's average weekly wage showed that each year the respondent employed the petitioner generally from April through December. The arbitrator found that the petitioner worked exclusively for the respondent for a period in excess of 15 years. During the "off" months, the petitioner collected unemployment compensation. He was not required to reapply each year for his construction job, but merely reported for work when called at the beginning of the season.

During the 52 weeks prior to his accident, the petitioner worked 20 weeks, earning $10,060.03 in regular wages. During this period, he also worked an additional 103.5 hours of overtime. The petitioner notes that if those 103.5 hours of overtime were calculated at his regular hourly wage, rather than at his higher overtime hourly wage, they would add $1,335.01 to his yearly earnings. His unemployment compensation rate was $154 per week.

██ ■ A person is totally disabled when he cannot perform any services except those for which no reasonably stable labor market exists. (*E.R. Moore Co. v. Industrial Comm'n* (1978), 71 Ill. 2d 353, 376 N.E.2d 206.) In determining whether an employee can perform any useful services, his age, training, education and experience must be taken into account. Unless he is obviously unemployable or unless he presents medical evidence to support a claim of total disability, a claimant has the burden of proving that no employment is available for a person in his circumstances. (*Valley Mould & Iron Co. v. Industrial Comm'n* (1981), 84 Ill. 2d 538, 419 N.E.2d 1159.) However, once the claimant establishes that he falls into the "odd-lot" category of persons who are not altogether incapacitated but are so handicapped that they will not be employed regularly in any well-known branch of the labor market, the burden shifts to the employer to show that some kind of suitable work is regularly and continuously

available to the claimant. 84 Ill. 2d 538, 419 N.E.2d 1159.

In the instant case, the record contains substantial evidence that the petitioner is unemployable. Given his work restrictions, minimal education, and few job skills and age, Drs. Chesser and Wilson indicated that any attempts at rehabilitation would probably be fruitless. Dr. Wilson opined that it was unlikely the petitioner would ever be gainfully employed again. Vocational consultant Paprocki testified that the petitioner had sustained a 100% industrial disability, in that there was no realistic chance of his finding a job.

■■ Based on this evidence, we find that the petitioner met his initial burden of proof under *Valley Mould*. There was no evidence to suggest that some kind of suitable work was available to the petitioner. Accordingly, we find that the Commission's determination that the petitioner was permanently totally disabled was not against the manifest weight of the evidence.

The respondent's second issue on appeal is that the Commission and the trial court erred in determining that the petitioner's average weekly wage was $511.95.

Section 10 of the Workers' Compensation Act (the Act) (Ill. Rev. Stat. 1981, ch. 48, par. 138.10) provides in pertinent part:

> "The basis for computing the compensation provided for in Sections 7 and 8 of the Act shall be as follows:
>
> The compensation shall be computed on the basis of the 'Average weekly wage' which shall mean the actual earnings of the employee in the employment in which he was working at the time of the injury during the period of 52 weeks ending with the last day of the employee's last full pay period immediately preceding the date of injury, illness or disablement excluding overtime, and bonus divided by 52; *but* if the injured employee lost 5 or more calendar days during such period, whether or not in the same week, then the earnings for the remainder of such 52 weeks shall be divided by the number of weeks and parts thereof remaining after the time so lost has been deducted." (Emphasis added.) Ill. Rev. Stat. 1981, ch. 48, par. 138.10.

In the instant case, the petitioner "lost five or more calendar days during such period," and, as we read the record, we find that the petitioner was in fact underpaid during the 52 weeks preceding his injury. Accordingly, the arbitrator, as approved by the Commission and the circuit court, used the hourly wage he was supposed to have been paid under his contract, from time to time, calculated what he should have earned during the preceding 52 weeks based

upon the number of nonovertime hours he worked, and divided the total by the 20 weeks he actually worked to arrive at an average weekly wage of $511.95.

The respondent and the *amicus curiae* argue that the Commission should have divided the petitioner's actual (nonovertime) earnings during the preceding 52 weeks by 52. In support of their position, the respondent and the *amicus* note that calculating by deducting lost time from the average weekly wage denominator, while paying workers' compensation benefits the year round, gives the petitioner a compensation award greater than the income he earned while working. The respondent and the *amicus* contend that such a result provides an unacceptable windfall to injured workers, citing cases under prior section 10 of the Act. (*Hasler v. Industrial Comm'n* (1983), 97 Ill. 2d 46, 454 N.E.2d 307; *Cardiff v. Industrial Comm'n* (1984), 128 Ill. App. 3d 52, 470 N.E.2d 1091.) The respondent and the *amicus* further argue that one cannot lose what one never had. Accordingly, they conclude that section 10's current provision for deducting lost days from the average weekly wage calculation applies only when the worker reasonably expected to work on the days he missed.

The current version of section 10 took effect September 15, 1980. Prior to that time, section 10 provided in relevant part:

"The basis for computing the compensation provided for in Sections 7 and 8 of the Act shall be as follows:

(a) The compensation shall be computed on the basis of the annual earnings which the injured person received as salary, wages or earnings if in the employment of the same employer continuously during the year next preceding the injury.

* * *

(e) As to [the] employees in employment in which it is the custom to operate for a part of the whole number of working days in each year, such number, if the annual earnings are not otherwise determinable, shall be used instead of 300 as a basis for computing the annual earnings, provided the minimum number of days which shall be so used for the basis of the year's work shall be not less than 200." Ill. Rev. Stat. 1979, ch. 48, pars. 138.10(a), (e).

In the *Hasler* and *Cardiff* cases, which were decided under the old section 10, the employees worked year round whenever their employers had work for them, Hasler performing both interior and exterior work as a painter and wallpaper hanger and Cardiff as a less-than-40-hour-per-week factory employee. Both employees sought to

be classified as "seasonal" workers under section 10(e), so that the denominator used in calculating their average weekly wages would be lower, giving them a higher average weekly wage under the Act. In each case, however, the court determined the employees were employed part time and calculated the average weekly wage under section 10(a).

In so doing, the Illinois Supreme Court noted that, under section 10(e), claimant Hasler would receive an award nearly six times greater than her actual earnings. Similarly, the *Cardiff* court noted that, under section 10(e), the claimant would receive an award nearly 10 times greater than her average weekly wage. Both courts stated that the purpose of the Act is to compensate, or "make whole," an injured employee, not to provide a windfall.

Having reexamined *Hasler* and *Cardiff*, we find that, while the principle against awarding windfalls was an important factor in both decisions, it was not the key factor. The primary factor in each case was the court's finding that the two "on-call" employees were not intermittent employees under section 10(e), but were "continuously employed" so as to come under section 10(a). The respondent and the *amicus* here attempt to equate the "on-call" employment situations in *Hasler* and *Cardiff* with the seasonal construction employee facts in the instant case.

■ The current version of section 10 appears to be a response by the legislature to *Hasler* and *Cardiff*. The new, simplified version of section 10 plainly states that in all cases where the employee lost five or more days of work during the 52 weeks prior to the injury, the lost time (to the extent not due to the fault of the employee) should be deducted from the wage calculation denominator. It is axiomatic that where the language of the statute is certain and unambiguous, the only legitimate function of the court is to enforce the law as enacted by the legislature. *Certain Taxpayers v. Sheahen* (1970), 45 Ill. 2d 75, 256 N.E.2d 758.

Examination of the legislative history of the current section 10 shows that it resulted from negotiations and compromise between business and labor interests. Senator DeAngelis, speaking to the Conference Committee Report on the subject bill, said:

> "Thank you, Mr. President. Senator Bruce, you did a fantastic job explaining a bill that you were not handed too long ago. I wish we'd have had you from the beginning, but thanks for coming aboard. I obviously stand in support of this bill, and whatever happens to it, I do want to indicate up front that I want to thank all the members of the General Assembly, and

particularly the hard work of the staffs on both sides for the unique response to a serious economic issue. I think what we have done, today, up to this point is a step forward for improving the image of Illinois not caring and I hope we can continue on a bi-partisan basis to continue to resolve the economic problems of Illinois. I urge your favorable support on this bill." (81st Ill. Gen. Assem., Senate Proceedings, July 1, 1980, at 42.)

Representative Donovan, the house sponsor of House Bill 3250, said:

"Thank you. Mr. Speaker, Ladies and Gentlemen of the House, House Bill 3250 as amended by the Senate and as revised in Conference Committee provides for a comprehensive reform in Illinois Worker's Compensation System. The terms of the Bill have been agreed by Members of both parties. And from all indications, both management and labor have agreed to the provisions. Mr. Speaker, I move for the concurrence with the First Conference Committee Report ***." (81st Ill. Gen. Assem., House Proceedings, July 1, 1980, at 255-56.)

The Conference Committee Report was overwhelmingly adopted by both Houses.

In drafting section 10 in a manner acceptable to the competing interests, the legislature obviously chose to dictate its own rates and calculation methods and departed from the revised model act issued by the Council of State Governments. Accordingly, the respondent's and the *amicus'* reliance on the model act in interpreting section 10 is unpersuasive.

In examining the legislative intent of section 10, we find that Senator Bruce, while explaining the Conference Committee Report on the subject bill in the Senate, said:

"Page forty-one, redefines the average weekly wage, so that a part-time employee is not paid on a full forty-hour week, but only receives compensation[—]if he works ten hours, he gets two-thirds of this ten-hour actual earnings." (81st Ill. Gen. Assem., Senate Proceedings, July 1, 1980, at 22.)

Clearly, Senator Bruce's statement concerns only part-time employees who are regularly not paid on a full 40-hour week basis, but are paid for a regular number of hours less than 40. As shown by his statement, if an employee actually worked 10 hours, the workers' compensation rate would be two-thirds of the 10-hour earnings. However, this has no effect on construction workers.

The special considerations accorded construction and seasonal

workers due to the unique nature of their work have long been recognized in Illinois. Thus, old section 10(e) deducted "off time" from the wage calculation denominator, but paid workers' compensation benefits the year round. Senator Bruce obviously indicated no change by reciting the created limitation on benefits to be for part-time workers who work less than 40 hours per week. It is worth noting that the instant petitioner would have qualified as a seasonal worker under old section 10(e). See *Rambert v. Industrial Comm'n* (1985), 133 Ill. App. 3d 895, 477 N.E.2d 1364; *Reynolds v. Industrial Comm'n* (1986), 151 Ill. App. 3d 695, 502 N.E.2d 1178.

Further, we observe that the redesigning of the current section 10 resulted in a provision which both benefits and disadvantages both business and labor. For instance, under section 10, overtime wages, bonuses and unemployment compensation are not considered in calculating average weekly wages, even though as a practical matter they account for a significant part of many seasonal workers' annual incomes, which benefit the employer. Offsetting those deductions is the instant lost-time deduction, which allows the Industrial Commission to calculate average weekly wages using a denominator of only those weeks actually worked, to the benefit of the employee. "Lost time" is synonymous with "off time," unless caused by the employee as aforesaid, or the phrase has no purpose.

While it must be assumed that the legislature does not intend to reward idleness and penalize good energetic employees, we note that as a practical matter, under our interpretation of section 10, the petitioner's compensation benefits will be more than his actual total income in the preceding year, but only slightly so. In this case the petitioner earned about $10,000 in regular wages, plus about $1,300 for overtime and received about $5,000 in unemployment benefits. We further consider that some construction workers might be injured during the first week of employment and others work most of the 52 weeks per year; that as far as weather is concerned, the construction season is longer in Carbondale than in Chicago; and that of course modern methods have lengthened construction seasons.

In any event, the slight windfall in this case is more than offset by the petitioner's inability to ever work again, and, even under the former section 10, the principle against windfalls was not absolute. The former section 10(e) provided a windfall for seasonal workers by deducting lost time from the wage calculation denominator, but workers' compensation benefits were paid the year around, as we have heretofore indicated.

Lastly, we also note that the respondent's and the *amicus'* argu-

ments that the award discourages rehabilitation are not relevant. The petitioner was found to be totally and permanently disabled and rehabilitation was not advanced as an issue in the case. Regardless, the need or opportunity for rehabilitation is a decision to be justified by medical and other expert authorities. Here, there was no offer of rehabilitation.

■ Based on the plain language of the statute and its history, we find that the arbitrator, the Commission and the trial court correctly determined the petitioner's average weekly wage. Due to the petitioner's failure to file a cross-appeal, we will not consider the issue he raises regarding his compensation. *National Football League Properties, Inc. v. Dallas Cap & Emblem Manufacturing, Inc.* (1975), 26 Ill. App. 3d 820, 327 N.E.2d 247.

The judgment of the circuit court of Rock Island County is affirmed.

Affirmed.

McNAMARA, WOODWARD, and CALVO, JJ., concur.

JUSTICE McCULLOUGH, specially concurring:
I agree with the result, but not the reasons therefor.

Section 10 provides four methods to determine the average weekly wage.

The first method determines the "actual earnings" of an employee who works 52 weeks prior to the injury date, with no lost time.

The second part of this same sentence applies to the same employee who but for lost days would have his average weekly wage determined pursuant to the first method. If he loses five or more calendar days during the 52-week period, whether or not in the same week, the time lost must be deducted and the earnings for the remainder of such 52 weeks shall be divided by the number of weeks and parts thereof remaining after the time lost has been deducted.

The above methods are included in one sentence and the average weekly wage definitions apply to the full-time employee.

The next sentence in section 10 provides a third method to compute "weekly average wage." Where the employment prior to the injury extended over a period of less than 52 weeks, you divide the earnings by the weeks or parts thereof during which the employee actually earned wages.

I submit that the "average weekly wage" of an employee deter-

mined pursuant to the first three methods would be the same. There would be a slight difference for the employee who lost less than five days, *i.e.*, one to four days.

The next sentence provides a fourth alternative and applies to employees:

    (1) recently employed;

    (2) whose employment is of a casual nature;

    (3) with special terms of employment.

The weekly wage of this employee is determined by determining the wages earned by an employee "in the same grade," employed at the same work, for each of 52 weeks for the "same number of hours per week," for the same employer. This section appears to be legislative response to the supreme court's decision in *Vaught v. Industrial Comm'n* (1972), 52 Ill. 2d 158. This method is to be used only when "it is impractical to compute the average weekly wages" by application of the three other alternatives.

It can be argued as impractical from a financial burden standpoint of the employer to apply the first three methods. The third method does fit the facts of this case. The employment extended over a period of less than 52 weeks prior to the injury. That the employee historically worked for many years for the same employer does not require a different result. As stated in Larson:

> "[T]he purpose of the wage calculation is not to arrive at some theoretical concept of loss of earning capacity; rather it is to make a realistic judgment on what the claimant's future loss is in the light of all the factors that are known." 2 A. Larson, Workmen's Compensation Law §60.21(c), at 10—667 (1987).

As stated above, the average weekly wage in this case should be determined by the third method. The employment extended over a period of less than 52 weeks prior to the injury. The time lost is deducted and the earnings of the "period" (the time of employment) are "divided by the number of weeks and parts thereof remaining after the time lost has been deducted."