D.J. MASONRY COMPANY, Appellant, v. THE INDUSTRIAL COM-
MISSION *et al.* (Chuck Botta, Appellee).

First District (Industrial Commission Division)   No. 1—96—4131WC

Opinion filed March 24, 1998.

Braun, Lynch, Smith & Strobel, Ltd., of Chicago (Mark A. Braun and Paul M. Hletko, of counsel), for appellant.

Horwitz, Horwitz & Associates, Ltd., of Chicago (Mitchell W. Horwitz and Marc A. Perper, of counsel), for appellee.

JUSTICE COLWELL delivered the opinion of the court:

Claimant, Chuck Botta, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 1994)) (Act) for injuries he sustained while working for D.J. Masonry Company (D.J. Masonry). The arbitrator awarded Botta temporary total disability for 98¹/₇ weeks and $2,500 in penalties under section 19(l) of the Act. See 820 ILCS 305/19(l) (West 1994). The Industrial Commission (Commission) modified the arbitrator's award by increasing the average weekly wage. The Commission also awarded Botta penalties and attorney fees pursuant to section 19(k) and section 16 of the Act. See 820 ILCS 305/16, 19(k) (West 1994). The circuit court confirmed the Commission's decision, but remanded the cause to the Commission for a recalculation of the attorney fees and penalties.

On appeal, D.J. Masonry contends that the State of Indiana, not the State of Illinois, has jurisdiction over this accident. Further, D.J. Masonry argues that the Commission's average weekly wage calculation is erroneous and that the Commission erred in awarding temporary total disability (TTD) benefits beyond November 30, 1993. Finally, D.J. Masonry maintains that no penalties should be awarded in this case. We affirm in part and reverse in part.

The record shows that in November 1988 Botta was unemployed and living in South Holland, Illinois. Tom Goralka, a friend of Botta, called Botta one day in November and told him that he currently worked for D.J. Masonry, which was located in Indiana. Goralka told Botta that D.J. Masonry might have a job for him and gave him the owner's phone number.

Botta immediately telephoned the owner, Richard Devries, who lived in Indiana. Botta told Devries that he was a friend of Goralka and that he was an experienced laborer looking for work. Devries told Botta to go to a jobsite in Crete, Illinois, the following morning and to speak with him.

Botta visited the Crete jobsite the next morning. He introduced himself to Devries and Devries commented on Botta's possessing his own tools. Devries told Botta to talk to the labor foreman and to tell the foreman that he was going to be given a trial. After speaking with the foreman, Botta worked the remainder of the day scaffolding and tending to the bricklayers. At the end of the day, around 4 p.m., Botta spoke with Devries. Devries told Botta that he did a good job and that, as far as he was concerned, Botta had a job. Devries then gave Botta tax forms to complete. Botta completed the forms that evening and gave them to Devries at the jobsite the next day.

Botta worked for D.J. Masonry through December 22, 1992. On December 22, Botta was injured when a scaffold fell on top of him while he was working at a jobsite in Indiana. There is no dispute between the parties that Botta was injured during the course of his employment.

At the arbitration hearing, Botta testified that he felt immediate pain in his leg, head, and back after the scaffold fell on top of him. While he waited for the paramedics, he noticed that his head was bleeding. The paramedics took Botta to the hospital. At the hospital, Botta had stitches over his eyes and in the back of his head. Botta went home that night. He did not return to work the next day.

Botta visited his family physician, Dr. Richard S. Kijowski, on December 24, 1992. On January 5, 1993, Botta noticed lower back and left leg pain. He reported to Dr. George S. Miz, a spinal surgeon. Dr. Miz ordered an MRI and physical therapy.

On February 18, 1993, Botta returned to Dr. Kijowski. According to Dr. Kijowski's medical records, Botta had not had any improvement with his "persistent severe left leg pain." Dr. Kijowski recommended surgery and discussed with Botta the possibility that he may not be able to return to work as a laborer.

On March 8, 1993, Botta had back surgery. He was discharged on March 9. Botta testified that, after the surgery, his back did not hurt as much, but that his left leg pain remained. Botta returned to physical therapy. In addition, he completed a work-hardening program. Botta stated that his left leg did not respond to the work hardening or the physical therapy.

On August 31, 1993, Dr. Miz prescribed an MRI. The MRI was conducted on September 17, 1993. According to the radiologist's

report, degenerative changes in Botta's back had occurred, but no disc herniation was detected.

In November 1993, Dr. Miz recommended an additional lumbar myelogram and post-myelogram CT scan. The tests were performed on January 18, 1994. According to the medical records, the tests revealed a small herniation and a mild generalized bulge.

At the request of D.J. Masonry, Botta was examined by Dr. Marshall Matz, a board-certified neurosurgeon, on November 30, 1993. According to Dr. Matz's December 1, 1993, report, Botta had good strength, normal reflexes, and walked without a limp. Also, Botta squatted only about a third of the usual range because, according to Botta, his left leg would not bend anymore.

In an evidence deposition, Dr. Matz testified that the results of the examination showed that Botta did not have a pinched nerve. In addition, Dr. Matz explained that Botta's pain in his leg was not radiating behind his knee. Therefore, his knee was simply a "localized area of discomfort." Then, Dr. Matz opined that Botta was not in need of further treatment. Dr. Matz explained that the neurological examination did not reveal any objective evidence of root involvement. Consequently, Botta could return to active employment with "common sense limitations and restrictions with prudent use of the lower back."

Dr. Matz next commented on Botta's September 17, 1993, MRI. Dr. Matz stated that the MRI's result of there not being any disc herniation supported his opinion. Further, the January 18, 1994, myelograms were "normal" in that they did not reveal that there was a herniated disk, root compression, or spinal stenosis. Dr. Matz explained that, taking into consideration his examination and these tests, there was no objective evidence that Botta "was suffering from any derangement about the lower back that required further treatment."

On March 25, 1994, Dr. Joseph G. Thometz, an associate of Dr. Miz, examined Botta. According to Dr. Thometz's report, Botta's flexion was limited. Further, the report indicates that Botta was in need of continued treatment and that he should not return to his construction duties.

Dr. Matz examined Botta again on March 30, 1994. Dr. Matz testified that, on that date, Botta's reflexes were normal and that he had good strength. Dr. Matz then expressed again his opinion that there was no objective evidence of low back derangement that necessitated further treatment. Further, Dr. Matz opined that a diskogram would not be beneficial in evaluating Botta's complaints. Instead, the tests already conducted, the MRI and the myelograms, could better detect any problem.

On cross-examination, Dr. Matz acknowledged that he does not prescribe diskograms for his patients unless they are required as part of a protocol for spinal tapping because he believes diskograms are outdated and "almost always" show that surgery should be performed. Dr. Matz stated that he disagreed with Dr. Miz's and Dr. Slack's diagnosis of left leg sciatica (nerve root compression). However, assuming a person did have left leg sciatica, he would impose legitimate work restrictions, including a restriction from heavy manual labor.

An April 14, 1994, letter from Dr. Miz to D.J. Masonry's insurance company states that Botta should receive further treatment for his leg. The report indicates also that Dr. Miz disagrees with Dr. Matz's opinion that Botta had reached maximum medical improvement.

In May 1994, Botta treated with Dr. Charles M. Slack. According to a letter to Dr. Slack from Botta's attorney, Botta was to be examined by Dr. Slack, by agreement of both parties, for purposes of his evaluation and treatment recommendations. The letter indicates that Botta's post-operative medical care is at issue in litigation and that Dr. Miz recommends a diskogram, while Dr. Matz recommends no further treatment.

According to Dr. Slack's medical report, Botta was experiencing leg pain at the time of his visit. The report recommends that, because Botta's pain was persistent, Botta should undergo a lumbar diskogram and post-diskogram CT "in an attempt to further delineate some of the [degenerative] changes" noted in the MRI. The report states that if a surgical lesion was not noted after the additional study, Botta should proceed with a functional capacity evaluation and work conditioning. Dr. Slack's report adds that Botta should "remain temporarily totally disabled."

At the arbitration hearing, Botta explained that, although he attempted to undergo the diskogram, the test had not been done because D.J. Masonry's insurance company refused to pay for it. Further, Botta explained that, in the four years that he worked for D.J. Masonry, he never visited the company's main office at its Cedar Lake, Indiana, location. Instead, he worked only at the various jobsites. Botta stated that the majority of the jobsites were in Illinois, but that about 25% of the jobsites were in Indiana.

Finally, Botta testified to the current condition of his leg. Botta stated that he cannot sit or stand for long periods and that he cannot walk for a long period. Botta said that his leg hurts if he takes a long stride or if he attempts to climb stairs. His leg hurts also when he bends over and tries to pick up something. Overall, the pain in his

leg is sharp, and it travels from his buttocks down to the back of his kneecap.

On cross-examination, Botta acknowledged that he visited a chiropractor "[o]nce or twice" in 1992 regarding his back. Botta then testified to the frequency of his work. Botta explained that, when the weather permitted and the work was available, Botta averaged a 40-hour week. Botta stated, however, that there were several times during the year when work was unavailable or when they were unable to work due to the weather. Finally, Botta acknowledged that he had not sought work of any kind anywhere since the accident.

The arbitrator determined first that Illinois had jurisdiction over Botta's claim because "the contract for hire" occurred in Illinois in that Devries hired Botta after Botta worked a day in Crete, Illinois. Second, the arbitrator found that D.J. Masonry's reliance on Dr. Matz as its basis for refusing to pay for the diskogram was improper. The arbitrator stated that there was no reasonable basis for D.J. Masonry to rely on Dr. Matz as its basis for withholding TTD benefits. Therefore, the arbitrator awarded Botta further compensation in the amount of $2,500 under section 19(l). Finally, the arbitrator determined that Botta was entitled to TTD benefits for $98^{1}/_{7}$ weeks.

The Commission modified the arbitrator's average weekly wage award from $506.06 to $575.90. The Commission also awarded Botta additional compensation of $18,839.44 under section 19(k) of the Act and attorney fees of $3,767.89 under section 16 of the Act. The Commission otherwise adopted the arbitrator's findings.

The circuit court affirmed the Commission's decisions concerning jurisdiction, Botta's average weekly wage, and the period for which Botta was temporarily and totally disabled. The court, however, found that the Commission erred in the calculation of section 19(k) penalties. The court added that, because the section 16 penalty award was based on the section 19(k) award, it too had to be set aside. Consequently, the court remanded the case to the Commission for calculation of the section 19(k) and section 16 awards.

On appeal, D.J. Masonry argues that Illinois is without jurisdiction to hear Botta's claim. Further, D.J. Masonry contends that the Commission's average weekly wage was computed contrary to law and that TTD benefits were improperly awarded beyond December 1, 1993. Finally, D.J. Masonry maintains that the Commission cannot award penalties and attorney fees in this case.

## I

■ We turn first to D.J. Masonry's contention that Illinois lacks jurisdiction to hear Botta's claim. Under the Act, there are three

bases for acquiring Illinois jurisdiction: (1) the contract for hire was made in Illinois; (2) the accident occurred in Illinois; and (3) the claimant's employment was principally localized in Illinois. See 820 ILCS 305/1(b)(2) (West 1994); *Burtis v. Industrial Comm'n*, 275 Ill. App. 3d 840, 842 (1995). In this case, the accident did not occur in Illinois; it occurred in Indiana. Accordingly, we have jurisdiction only if the contract for hire was made in Illinois or Botta's employment is principally localized in Illinois.

The place where a contract for hire was made is the place where the last act necessary for the formation of the contract occurred. *Youngstown Sheet & Tube Co. v. Industrial Comm'n*, 79 Ill. 2d 425, 433 (1980). Whether a contract for hire was made in Illinois is a question of fact for the Commission to determine. *F&E Erection Co. v. Industrial Comm'n*, 162 Ill. App. 3d 156, 168 (1987). We will not overturn the Commission's decision unless that decision is against the manifest weight of the evidence. *Ford Aerospace & Communications Services, Inc. v. Industrial Comm'n*, 262 Ill. App. 3d 1115, 1120 (1994). For a finding to be contrary to the manifest weight of evidence, an opposite conclusion must be apparent. *Teska v. Industrial Comm'n*, 266 Ill. App. 3d 740, 742 (1994). Indeed, a decision is contrary to the manifest weight of evidence only when the court determines that no rational trier of fact could have agreed with the agency's decision. *Board of Trustees of Southern Illinois University v. Knight*, 163 Ill. App. 3d 289, 291 (1987).

■ The record shows that, in his conversation with Botta, Devries told the claimant to report to a site in Illinois to meet with him. Botta reported to the Illinois site and spoke with Devries. Devries did not tell Botta that he had a job at that time. Instead, he instructed Devries to tell the foreman that he was going to be given a trial. Botta worked the entire day before speaking with Devries again about the job. At that time, Devries told Botta he had done a good job and gave him tax forms.

There is nothing in the record that disputes Botta's testimony at the arbitration hearing. Further, there is no evidence that Devries guaranteed Botta a job during his telephone conversation with him. In addition, there is nothing in the record that suggests that Devries gave Botta a job before Botta reported to the site. Indeed, Devries gave Botta the tax forms *after* Botta completed the day of work and *after* telling Botta that, as far as he was concerned, Botta had a job. We find that these facts support the Commission's finding that the contract for hire occurred at the jobsite in Illinois.

D.J. Masonry contends that Devries offered Botta the job during their phone conversation, and Botta's showing up at the Illinois job-

site was merely an acceptance of the job offer. Therefore, because the job offer was made from Indiana, the contract for hire was made in Indiana, not Illinois. We disagree.

In *Ford Aerospace & Communications Services, Inc.*, the claimant, who lived in Chicago, sent a résumé to the employer's Nevada office. An individual from the employer's personnel office contacted the claimant and told him to fill out an application. The claimant completed the application and mailed it to Nevada. The application stated that the claimant would not become an employee until he signed an employment agreement. The claimant subsequently flew to Nevada for a physical and an orientation program. Upon arriving in Nevada, the claimant signed the employment agreement. Several months later, the claimant was injured in the course of his employment. He filed a claim under the Act, alleging that Illinois had jurisdiction over his claim because the contract for hire was made in Illinois due to his completing the application in Illinois. *Ford Aerospace*, 262 Ill. App. 3d at 1116-17.

The *Ford Aerospace* court found that Illinois lacked jurisdiction to hear the claimant's case. The court explained that, pursuant to the application's instructions, the claimant did not become an employee until he signed the employment agreement. Consequently, the signing of the employment agreement served as the last act necessary for the formation of the contract. Thus, as the claimant signed the form in Nevada, the last act, and therefore the contract, was completed in Nevada, and Illinois did not have jurisdiction over the claim. *Ford Aerospace*, 262 Ill. App. 3d at 1120-21.

In this case, a similar condition to employment existed. Before being hired, Botta had to work a day as a "trial." This trial work day occurred in Illinois. Indeed, the last act necessary to the formation of the contract was Devries' accepting Botta as an employee *after* Botta's trial day of work at the jobsite. D.J. Masonry's hiring of Botta could have been shown by Devries' telling Botta he had a job, his giving Botta tax returns, or his informing Botta where to come to work the next day. All of these "last acts," however, occurred in Illinois. Accordingly, we find that the Commission's decision that the contract for hire occurred in Illinois is not against the manifest weight of the evidence.

As we have determined that Illinois has jurisdiction over Botta's claim because the contract for hire occurred in Illinois, we decline to address whether jurisdiction would vest under the principally localized test.

## II

The material in this section is not to be published pursuant to Supreme Court Rule 23 (166 Ill. 2d R. 23).

## III

■ D.J. Masonry argues next that the Commission's calculation of Botta's average weekly wage is contrary to law. Section 10 of the Act provides the basis for computing compensation. See 820 ILCS 305/10 (West 1994). Pursuant to section 10, an employee's average weekly wage is computed by taking the employee's actual earnings of the last 52 weeks immediately preceding the date of injury and dividing by 52. 820 ILCS 305/10 (West 1994); *McCartney v. Industrial Comm'n*, 174 Ill. App. 3d 213, 215 (1988). If, however, the employee lost five or more calendar days during that 52-week period, whether or not in the same week, the earnings for the remainder of the 52 weeks shall be divided by the number of weeks and parts thereof remaining after the time so lost has been deducted. 820 ILCS 305/10 (West 1994).

■ The Commission determined that, after subtracting time lost due to inclement weather and work being unavailable, Botta worked 204 days out of a 260-day year. The Commission divided 204 days by a 5-day work week to reach the number of weeks, 40.8, out of the 52-week year Botta worked. The Commission then divided this number, 40.8, into $23,496.88, the amount of Botta's earnings during this period, as stipulated to by the parties, and arrived at an average weekly wage of $575.90. This number yields a compensation rate of $383.93 weekly in TTD benefits. See 820 ILCS 305/8(b)(1) (West 1994) (TTD award is two-thirds of an employee's average weekly wage).

On appeal, D.J. Masonry contends that this weekly award results in a windfall for Botta. D.J. Masonry maintains that, if Botta receives $575.90 a week for the next 52 weeks, he will earn $29,946.80 in a year, which is $6,449.92 more than the $23,496.88 he earned the year before his injury. Therefore, the Commission's calculation is incorrect, and Botta's average weekly wage should be determined by dividing $23,496.88 by 52 weeks.

Initially, we note that a Commission's wage determination is a question of fact that a reviewing court will not disturb on appeal unless it is contrary to the manifest weight of the evidence. *Ogle v. Industrial Comm'n*, 284 Ill. App. 3d 1093, 1096 (1996). We find that the Commission's wage determination is not against the manifest weight of the evidence.

In *McCartney v. Industrial Comm'n*, 174 Ill. App. 3d 213 (1988), the court found that the Commission's dividing the claimant's earn-

ings by 52 weeks was against the manifest weight of the evidence because the claimant, a construction worker, "was often laid off from work for long periods of time" due to bad weather. 174 Ill. 2d at 215. The court said that the evidence adduced at the arbitration hearing showed that the claimant worked only 509 hours in the 12 months preceding the injury. Accordingly, although the claimant did not present detailed proof as to the number of weeks and parts thereof worked, the *McCartney* court reversed the Commission's award and remanded the case to the Commission for a proper wage determination. *McCartney*, 174 Ill. App. 3d at 215.

Unlike the claimant in *McCartney*, here the claimant carefully documented what weeks he worked and what parts of weeks he worked for the 52-week period preceding his injury. Consequently, in this case the Commission had before it sufficient evidence to conclude that Botta missed at least five days of work, and, therefore, his earnings could not be divided by 52 to compute his average weekly wage. See 820 ILCS 305/10 (West 1994); *McCartney*, 174 Ill. App. 3d at 215. Instead, Botta's earnings had to be divided by the "number of weeks and parts thereof remaining after the time so lost ha[d] been deducted." See 820 ILCS 305/10 (West 1994).

After reviewing Botta's exhibit, Botta's pay stubs, and D.J. Masonry's wage statement, the Commission determined that Botta missed 56 days of work out of a 260 work-day year, meaning Botta worked 40.8 weeks out of the 52 weeks. As a result, instead of 52, the Commission divided Botta's earnings by 40.8. As this procedure comports with section 10, we find that the Commission's average weekly wage figure is not against the manifest weight of the evidence.

■ D.J. Masonry repeatedly emphasizes in its brief that the Commission's award is wrong because it results in a windfall, an outcome that is contrary to law, and, in effect, unconstitutional. We disagree. First, we note that, in his treatise on worker's compensation law, Professor Larson acknowledges that the computation of an employee's average weekly wage may be higher or lower than the employee's actual wage. Professor Larson adds, however, that such a result is not unreasonable or unfair unless the wages for the period are abnormally high or abnormally low. 2A. Larson, Workmen's Compensation Law § 60.11(d), at 10—632 through 10—633 (1996).

Second, this court addressed the issue of an employee's receiving such a windfall in *Illinois-Iowa Blacktop, Inc. v. Industrial Comm'n*, 180 Ill. App. 3d 885 (1989). In *Illinois-Iowa Blacktop*, the Commission divided the claimant's earnings by the 20 weeks the claimant actually worked instead of by 52 weeks because the claimant missed

more than 5 days of work during the 52-week period preceding his injury. The claimant's employer appealed, arguing that the Commission should have used 52 weeks in its division, because the use of 20 weeks resulted in a windfall. *Illinois-Iowa Blacktop*, 180 Ill. App. 3d at 890.

The *Illinois-Iowa Blacktop* court thoroughly reviewed the legislative history of the current section 10. The court explained that the redesigning of section 10 resulted in both benefits and disadvantages for laborers. Then, the court determined that the "slight windfall" that results by a claimant's compensation benefits totaling more than his actual total income does not make the statute ambiguous or illegitimate. *Illinois-Iowa Blacktop*, 180 Ill. App. 3d at 893; see also *Ricketts v. Industrial Comm'n*, 251 Ill. App. 3d 809, 811 (1993) (potential windfall to an employee is only a viable, not a determinative, consideration when calculating an average weekly wage); *Peoria Roofing & Sheet Metal Co. v. Industrial Comm'n*, 181 Ill. App. 3d 616, 620 (1989) (fact that a windfall may develop is not "fatal" to Commission's wage calculation). Indeed, the *Illinois-Iowa Blacktop* court noted that, even under the old version of section 10, "the principle against windfalls was not absolute." *Illinois-Iowa Blacktop*, 180 Ill. App. 3d at 893. Consequently, the court affirmed the Commission's use of 20 weeks in the calculation of the claimant's average weekly wage. *Illinois-Iowa Blacktop*, 180 Ill. App. 3d at 894.

Similarly, in this case, Botta's possibly receiving a windfall is not fatal to the Commission's wage determination. Moreover, we note that any windfall Botta is to receive is minor to nonexistent. Certainly, D.J. Masonry's argument that Botta will receive $6,000 more a year due to the Commission's average weekly wage figure is misleading. In its calculation, D.J. Masonry multiplies $575.90 by 52 weeks to obtain its $29,946.80 figure. In actuality, however, Botta only receives two-thirds of the average weekly wage amount for TTD benefits, or $383.93. See 820 ILCS 305/10 (West 1994). This figure being multiplied by 52 weeks yields a result of $19,964.36, which is $3,532.52 lower than Botta's earnings the year preceding his injury. Consequently, unlike the claimant in *Illinois-Iowa Blacktop*, Botta is not obtaining a windfall. See *Illinois-Iowa Blacktop*, 180 Ill. App. 3d at 886, 893 (amount claimant *received* weekly multiplied by 52 weeks resulted in windfall). Instead, Botta will earn approximately what he earned in the year preceding his injury, and the Commission's wage determination reasonably represents Botta's earning potential. See *Edward Hines Lumber Co. v. Industrial Comm'n*, 215 Ill. App. 3d 659 (1990); 2 A. Larson, Workmen's Compensation Law § 60.21(c), at 10—667 (1996) (purpose of wage calculation is to make a realistic judgment on what claimant's future loss will be).

IV

The material in this section is not to be published pursuant to Supreme Court Rule 23.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part and reversed in part.

Affirmed in part, reversed in part.

McCULLOUGH, P.J., and RAKOWSKI, HOLDRIDGE, and RAR-ICK, JJ., concur.