CORRECT CONSTRUCTION COMPANY, INC., Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Michael R. Beltz, Appellee).

First District (Industrial Commission Division)   No. 1—98—4290WC

Opinion filed August 31, 1999.—Rehearing denied September 30, 1999.

Richard S. Sawislak, of O'Connor, Schiff & Myers, of Chicago, for appellant.

William M. Wippold, of Patrick E. Dwyer & Associates, Ltd., of Chicago, for appellee.

JUSTICE RAKOWSKI delivered the opinion of the court:

Claimant Michael R. Beltz, an Illinois resident, sought benefits pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1994)) for injuries sustained on October 10, 1994, at an In-

diana jobsite while in the employ of Correct Construction Company, Inc. (Correct). The arbitrator found that Illinois had jurisdiction over this matter and determined that Beltz suffered 20% permanent loss of the use of his right hand. The Industrial Commission of Illinois (Commission) affirmed the arbitrator's finding of Illinois jurisdiction but modified claimant's award, finding that he suffered only 12½% permanent loss of the use of his right hand. The circuit court confirmed the decision of the Commission.

On appeal, Correct contends that the last act necessary to form an employment contract was its decision to hire claimant, which occurred at the jobsite in Indiana, and not claimant's telephone acceptance of the union's employment referral. We agree and therefore reverse the judgment of the circuit court.

## STATEMENT OF FACTS

Claimant, a pipe fitter, belonged to the Pipe Fitters Association, Local Union 597 (the Union). The Union's primary hiring hall was located in Chicago, Illinois, but it also operated a satellite hall in Hammond, Indiana. As a Union member, claimant could not independently look for work but was required to follow the Union's procedure for securing employment. According to claimant, a Union member could go to either the Chicago or Hammond hiring hall to sign up on the out-of-work list.

With respect to this particular project, claimant testified that he was at his home in Illinois when the Union business agent from the Hammond hiring hall contacted him regarding an available job at Correct. The jobsite was at the Amoco plant located near Whiting, Indiana. Claimant informed the business agent that he would accept the position and arrived at the jobsite around 7 a.m. the following day. Upon checking in, claimant was given an application for employment and tax forms to fill out. He also provided Correct with his drug screening card. However, he did not recall attending a safety conference, receiving paperwork regarding safety requirements, or signing a "Contractor Safety Committee, Hazard Communication Training Record." According to claimant, after he filled out the application he was assigned to work, though he did not recall what time that was.

Edwin Patz, the business agent for Pipe Fitters Local 597, testified that he primarily works out of the Hammond office but he also works at the Chicago office at least one evening a week. His duties include working with and interpreting various agreements between the Union and contractors that govern hiring procedures. According to Patz, claimant's work at the Amoco plant fell within the scope of either the "Industrial Maintenance Agreement," which governs maintenance of

existing construction, or the "Area Agreement," which governs new construction. In 1994, the hiring hall procedures were amended. Patz testified that the amendments to the Industrial Maintenance Agreement and the Area Agreement are identically worded and do not conflict with each other. Collectively, these documents contain the hiring procedures to which the Union and Correct agreed.

According to Patz, the hiring agreements provided that a contractor was required to hire members through the hiring hall unless the contractor was hiring a supervisor or hiring on an emergency basis at a time when the hiring hall was closed. In describing how the agreements were generally implemented, Patz stated that an individual Union member fills out a form stating his qualifications and other pertinent information and is then placed on the out-of-work list. That information is then entered into the computer system, which lists the names according to the date and time the member signed up. A member must sign up in person, but he can sign up at the Chicago hall and still be hired out of the Hammond hall. Both hiring halls operate from the same out-of-work list, and a member need not personally go to Hammond to be hired from that hall.

A contractor may request a specific individual if that person has worked for the contractor within the preceding year. Generally, a contractor faxes the hiring hall a form indicating the position and the necessary job qualifications. The computer then matches this request with the first person on the out-of-work list whose qualifications meet the contractor's requirements. Patz would then call the Union member who was selected and determine whether that member was willing to accept the position. Finally, Patz would fax the contractor and provide it with the name of the individual who accepted the job.

According to Patz, when a Union member reports to a jobsite, he usually must fill out and sign certain forms, including forms pertaining to safety regulations and drug testing. He did not know whether a member usually had to fill out an employment application. Pursuant to the hiring agreement, a member should be paid for the time he spends filling out such paperwork, though Patz did not know whether members actually were paid for this time.

Patz acknowledged that the 1994 amendment to the "Hiring Hall Area Agreement" provided that the "employer shall have the sole and exclusive responsibility for hiring" and that the "[e]mployer shall have the sole and exclusive right of accepting or rejecting applicants for work." The amendment also provided:

> "A person that accepts an employment referral but who is not employed by the employer shall not receive show-up pay or any other compensation."

Patz stated that Union members who go to a jobsite must comply with the employer's hiring requirements such as safety, drug testing, and experience. However, he denied that the contractor could, "at any time," reject an "employee" based on the hiring agreement. According to Patz:

"[I]f the man is supposed to start at 7:00 o'clock and he shows up, and up until 7:00 o'clock the employer comes and says regardless of the reason I am not going to employ you, he does not have to pay show-up time. He has the right of refusal. If it's after starting time it's too late."

Patz also testified that an employer can refuse to "hire" an "employee" who does not report to the jobsite with the necessary documents or credentials. In that situation, the "employee" is not entitled to receive show-up pay.

In this case, Patz stated that Correct was informed that claimant would be sent to the jobsite. Patz acknowledged that contractors have refused to hire referred Union members after receiving the fax indicating the name of the individual referred. He also admitted that contractors have occasionally rejected referred members after the individual arrived at the jobsite, even where the contractor knew beforehand who had been referred.

Pat Szwajkowski, the office manager for Correct at the Amoco jobsite, testified that her job responsibilities included "processing and hiring referrals from the Union hall," including claimant. A person referred from the hiring hall was required to fill out a "Work Application Form" and tax forms, to provide verification that he was eligible to work in the United States, such as a driver's license or social security card, and provide his drug screening card. The referral receives a "New Hire Rehire Form," detailing various workplace regulations. Additionally, a prospective employee who does not have a current Amoco safety badge, such as claimant, must attend a four-hour safety orientation. A person who failed to provide the required documentation or to complete the safety orientation would not be hired.

Once an individual meets these requirements, he is "hired" and paid for the time spent filling out forms and attending the safety seminar. Szwajkowski testified that Union members who accept employment referrals are occasionally rejected after arriving at the jobsite. Further, she has rejected people who arrived without proper identification or for "other reasons," and those people did not receive pay.

Warren Winter, manager of field operations for Correct, testified that he was responsible for ensuring that the hiring hall procedure was followed and sending requests to the hiring hall for employees. He

sent the request that resulted in claimant's eventual hire to both the Chicago and the Hammond hiring halls.

Winter understood that pursuant to the hiring hall agreements Correct had the right to hire or refuse to hire any individual referred by the hiring hall. A prospective employee could be refused for any nondiscriminatory reason, including lack of qualifications or poor work record. According to Winter, Correct had no obligation to pay a prospective employee who was not hired. Winter acknowledged that it was not common practice to reject Union referrals at the jobsite, though Correct had done so on one occasion.

Winter acknowledged that Correct kept records of referrals who had previously proved unsatisfactory. Winter further testified that the hiring hall is sometimes notified in advance if a referral is unacceptable. However, the work records are not always checked before the referral arrives at the jobsite.

The arbitrator concluded that the last act necessary for contract formation was claimant's decision to accept or reject Correct's offer of employment. Accordingly, the arbitrator held that Illinois jurisdiction was proper because claimant was in Illinois when he informed the hiring hall that he would accept Correct's offer. In support of this conclusion, the arbitrator noted that the "Pipe Fitter's Guide to Using the Pipe Fitter Hiring Hall" (Pipe Fitter's Guide) provided that a Union member could refuse to accept three employment referrals before losing his position on the out-of-work list.

## ANALYSIS

■ Pursuant to the Act, Illinois may acquire jurisdiction over a claim (1) if the contract for hire was made in Illinois, (2) if the accident occurred in Illinois, or (3) if the claimant's employment was principally located in Illinois. 820 ILCS 305/1(b)(2) (West 1994); *D.J. Masonry Co. v. Industrial Comm'n*, 295 Ill. App. 3d 924, 929-30 (1998). In the instant case, claimant's work was not principally located in Illinois, nor was he injured within Illinois. Accordingly, we may exercise jurisdiction over this matter only if the contract for hire was made in Illinois.

■ " '[E]mployment contracts made in Illinois are normally to be interpreted as including an agreement by the parties to be bound by the Act even when the contemplated employment is exclusively in other States.' " *Burtis v. Industrial Comm'n*, 275 Ill. App. 3d 840, 842 (1995), quoting *United Airlines, Inc. v. Industrial Comm'n*, 96 Ill. 2d 126, 130 (1983). A contract for hire is made where the last act necessary for the formation of the contract occurred. *Hunter Corp. v. Industrial Comm'n*, 268 Ill. App. 3d 1079, 1083 (1994). Whether Il-

linois has jurisdiction over this matter "involves a factual inquiry as well as an application of the law" to the facts. *United Airlines, Inc.*, 96 Ill. 2d at 131-32. A factual determination, such as whether a contract for hire has been made in Illinois, is within the purview of the Commission and will not be disturbed on review unless it is against the manifest weight of the evidence. *Hunter*, 268 Ill. App. 3d at 1083.

The "Amendment & Supplement to the Industrial Maintenance Hiring Hall Agreement" and the "Amendment & Supplement to the Hiring Hall Area Agreement" both contain the following language:

"The Employer shall have the sole and exclusive right of accepting or rejecting applicants for work.

\* \* \*

A person who *accepts an employment referral but who is not employed by the Employer* shall not receive show-up pay or other compensation.

\* \* \*

The Union will not test the skills of persons registering on the 'out-of-work' list.

The Employer shall have the sole and exclusive right to determine whether a person referred for employment has the qualifications required by the Employer, shall have the sole and exclusive responsibility for hiring and *shall have the sole and exclusive right to accept or reject for employment persons referred for employment* provided the Employer shall not illegally discriminate.

Each Employer shall maintain a record, and shall notify the Hiring Hall in writing within seven (7) days of the event, of all hires \*\*\*." (Emphasis added.)

■ This language clearly contemplates that the last act necessary for contract formation is the employer's decision to hire the referred Union member. The agreements expressly state that the employer has the "exclusive right to accept or reject persons referred for employment." They also consistently distinguish between a Union member's acceptance of an employment referral and the employer's decision to hire that individual. Additionally, the employer, and not the Union, determines whether a referral is qualified for the available position. In most cases, an employer would not be able to assess a particular person's qualifications without having any contact with that person. The only condition placed on the employer's ability to reject a person referred for employment is that the rejection cannot be illegally discriminatory. Finally, in the event that a Union member is hired, the employer is required to notify the hiring hall. If the contract for hire is formed when the Union member informs the Union's business agent that he will accept the employment referral, there would be no need for the employer to notify the hiring hall that the member had been hired.

Relying on the following provision, claimant argues that the Union was the "exclusive hiring agent" for Correct:

"Employers shall obtain all Employees, except Apprentices, to fill each job for which it does not have a current employee, by requesting the Hiring Hall to refer a prospective Employee ***."

We disagree. When considered in conjunction with other provisions in the hiring agreements, it is clear that the Union is the exclusive *referral* agent for Correct, as distinct from the exclusive *hiring* agent. Although Correct is required to seek all "prospective" employees from the Union, it is not required to hire whomever the Union refers. Correct retains the "sole and exclusive right to accept or reject for employment persons referred for employment." Accordingly, this provision does not provide a basis for finding that the last act necessary to form a valid contract occurred when claimant informed the hiring hall that he would accept the employment referral.

Nor does the Pipe Fitter's Guide, which the Commission relied on, provide a basis for Illinois jurisdiction. According to Patz, the Pipe Fitter's Guide was mailed to all *Union members* and explained post-amendment hiring hall procedures. Initially we note that the Pipe Fitter's Guide was not sent to contractors and nothing in the record suggests that it was part of the hiring agreements between the Union and the contractors. Accordingly, it is not a binding agreement, and any finding of jurisdiction based solely on this document is questionable.

More importantly, when considered in its entirety, the Pipe Fitter's Guide actually supports the conclusion that the last act necessary to form an employment contract was the employer's acceptance of the referred Union member and not the member's acceptance of the employment referral. The Commission determined that the Union member retained the right to reject employment referrals, and therefore the last act necessary to form a valid contract occurred in Illinois. In reaching this conclusion, the Commission relied upon the following provision contained in the Pipe Fitter's Guide:

"If you meet the Employment Requirements and you refuse three referrals, you shall move to the bottom of the list."

However, the same section also states that a member who refuses a referral is not eligible to receive further referrals on the same day unless there is no other qualified person on the out-of-work list. When considered in its entirety, this section merely details the manner in which the Union administers the referral system. It does not support the proposition that the last act necessary for contract formation is the Union member's acceptance of the employment referral.

Moreover, the Commission failed to consider the following provisions, which are also included in the Pipe Fitter's Guide:

## "1. INTRODUCTION

### The Hiring Hall—An Overview

*A person who accepts a referral shall report to the job, where the employer may hire or reject that person at the Employer's discretion,* other than for an illegal discriminatory reason. A person who is rejected retains his/her position on the Out-of-Work List.

\* \* \*

## 12. PROCEDURE—WHEN AN EMPLOYER REJECTS A REFERRED PIPE FITTER

A. The Employer shall have the sole and exclusive right to determine qualifications for particular job assignments of persons referred for employment. The Union will not test the skills of persons registering on the Out-of-Work List.

B. The Employer shall have the sole and exclusive responsibility for hiring.

C. *A referred employee may be accepted or rejected by the Employer.* Rejection may be for any reason which is not illegally discriminatory \*\*\*.*" (Emphasis added.)

Like the hiring agreements, the Pipe Fitter's Guide expressly states that the employer may "accept or reject" a referred Union member. Additionally, the Pipe Fitter's Guide clearly states that the employer may wait until the prospective employee reports to the jobsite before deciding whether to hire him.

Alternatively, claimant argues that Correct, through its course of conduct, waived its right to reject referred Union members at the jobsite. According to claimant, in practice a referred Union member was always hired unless the employer notified the hiring hall that the member was unacceptable before he reported to the jobsite. Patz, Winter and Szwajkowski testified that referred members were occasionally rejected at the jobsite, though it is not clear from the record when the on-site rejections occurred. However, even if we accept claimant's position that no on-site rejections occurred subsequent to implementation of the amendments to the hiring hall agreements, claimant still cannot prevail. The amendments were effective April 18, 1994, and plaintiff was hired on or about October 7, 1994. We are not persuaded that, because Correct did not exercise its right to reject a prospective employee at the jobsite during this time frame, it waived its right to do so. Similarly, Correct's practice of notifying the Union that a referred member was unacceptable before that member reported to the jobsite did not constitute a modification of the hiring agreements. Accordingly, the hiring agreements apply as written and as agreed to by both the Union and Correct. Pursuant to those agreements, the only condition placed on the employer's right to accept or

reject a prospective employee is that the rejection may not be illegally discriminatory. The hiring agreements do not provide that the employer must notify the hiring hall of its decision to reject a referred member before that member reports to the jobsite.

Claimant was required to demonstrate that he passed a screening for illegal drug use, verify that he was eligible to work in the United States, fill out various forms, and attend a four-hour safety seminar. If claimant had failed to fulfill any one of these requirements, or if he had not otherwise been qualified, Correct would not have hired him, and he would not have been paid for his time. After determining that claimant was qualified to fill the position, Correct decided to hire him, which was the last act necessary to form the employment contract. As this event occurred in Indiana, Illinois does not have jurisdiction over this matter.

Finally, we reject claimant's argument that the instant case is analogous to *Hunter*. In that case, Hunter Corporation (Hunter) placed a call to Local 1, located in Illinois, requesting boilermakers to work at a jobsite in Indiana. The Local 1 referral officer then called the claimant and told him to report for work in Indiana. After arriving at the jobsite, the claimant filled out various forms, including tax forms and an "employment record" which was referred to by Hunter's manager as a "sign-up form." *Hunter*, 268 Ill. App. 3d at 1084. Although there was testimony indicating that the applicable referral rules provided that the employer retained the right to reject a Union member referred for employment, the *Hunter* court nonetheless concluded that the last act necessary for contract formation occurred at the Union hall when the Union member accepted the employment referral. *Hunter*, 268 Ill. App. 3d at 1084.

In reaching this conclusion, the court primarily relied on three factors: (1) a "referred employee" was entitled to two hours' pay if he went to the jobsite in response to a referral and the employer did not have work for him; (2) the referred employee was required to fill out a "sign-up form" and not a job application; and (3) if the employer rejected a referred employee for any reason other than "physical incapacity or lack of qualifications, a grievance would be filed." *Hunter*, 268 Ill. App. 3d at 1084.

The instant case is distinguishable on each of these points. Unlike the hiring agreements at issue in *Hunter*, in the instant case a prospective employee who is not hired is not entitled to show-up pay. The manager of field operations for the boiler division of Hunter Corporation testified that the "employment blank was not a job application, but referred to it as a 'sign-up form.'" *Hunter*, 268 Ill. App. 3d at 1084. In this case, one of the forms claimant was required to fill out

was consistently referred to as an application. Additionally, in *Hunter* the president of Local 1 testified that "[a]lthough the referral rules stipulated that the employer retained the right to reject a referred employee, *** if the rejection were based on other than physical incapacity or lack of qualifications, a grievance would be filed." *Hunter*, 268 Ill. App. 3d at 1084. There is no similar testimony in the case at bar.

For these reasons, we do not find *Hunter* dispositive of the instant case. Moreover, it is important to note that in the instant case the relevant agreements were included in the record on appeal. And although there are similarities between *Hunter* and the instant case, the precise details of the hiring agreements at issue were not provided in *Hunter*.

For the foregoing reasons, the judgment of the circuit court is reversed.

Reversed.

McCULLOUGH, P.J., and COLWELL, HOLDRIDGE, and RARICK, JJ., concur.